James TRACY, William Adams, Robert Arnold, Arthur Betsch, Santos Cepeda, Douglas Coleman, Harold Gonzalez, Lennell Howard, Elliot Hunt, Billy Little, Larry Moore, Robert Oakley, Emanuel Ordine, Jr., Larry Pleasant, George Reed, Anthony Repetti, Cordell Robinson, William Rodriguez, Dennis Soares, Michael Thomas, and John Turrisi, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

Dominick SALAMACK, Superintendent, Bayview Correctional Facility, Captain Hylan T. Sperbeck, Correction Officer, Bayview Correctional Facility, Benjamin Ward, Commissioner, Department of Correctional Services, State of New York, Defendants.

No. 77 Civ. 3937.

United States District Court, S. D. New York.

Oct. 14, 1977.

Memorandum Opinion Nov. 7, 1977.

Prisoners' Legal Services of New York, New York City, for plaintiffs; Susan N. Herman, Daniel J. Steinbock, Pierce Gerety, Jr., New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen. of the State of New York, New York City, for defendants; Kevin J. McKay, Asst. Atty. Gen., New York City, of counsel.

LASKER, District Judge.

In 1969, the New York State correctional system instituted a Temporary Release Program [1] designed to help inmates eligible for parole to reintegrate into society. An inmate who is eligible for parole within one year may apply to the program. If accepted, he is assigned to a work release facility from which he may seek either employment or schooling. In July of 1977, in reaction to incidents which disquieted the legislature and the public, the New York legislature amended the Temporary Release Law. The amendments specify that no applicants for the program convicted of any of three particular offenses may participate in the program without the written approval of the Commissioner of Correctional Services. [2] The effective date of the amended statute was September 1, 1977. Nevertheless, in August of 1977 the Department of Correctional Services, without having first promulgated regulations as required by the statute, engaged in a four step review procedure of 824 temporary release participants and removed 140 from the program. [3]

---

1. N.Y. Correction Law §§ 851 *et seq.* (McKinney's Supp.1976–77).

2. The pertinent portion of the amended statute reads as follows:

 "If an inmate is denied release on parole, such inmate shall not be deemed an eligible inmate until he is within one year of his or her next scheduled appearance before the state parole board. No person convicted of any escape or absconding offense defined in article two hundred five of the penal law shall be eligible for temporary release. Notwithstanding the foregoing, no person who is an otherwise eligible inmate who is under sentence for a crime involving: (a) infliction of serious physical injury upon another as

defined in the penal law, (b) a sex offense involving forcible compulsion, or (c) any other offense involving the use or threatened use of a deadly weapon may participate in a temporary release program without the written approval of the commissioner. The commissioner shall promulgate regulations giving direction to the temporary release committee at each institution in order to aid such committees in carrying out this mandate." §§ 851 *et seq.*, as amended, July 13, 1977.

3. These four steps were followed: (1) each inmate was scored according to the "Vera Point Selection" system; (2) each case was then submitted to a three member panel for scrutiny in accordance with the governing statute; (3) recommendations concerning the participants

The 140 inmates have brought this civil rights action and move for a preliminary injunction requiring the Department to reinstate them and to grant them hearings complete with the requirements of *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) before any future change in their status.[4] For the reasons stated below, the injunction is granted.

## I.

■■■■ A preliminary injunction may be granted only upon "a clear showing of either (1) probable success on the merits *and* possible irreparable injury *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting preliminary relief." *Triebwasser & Katz v. American Tel. & Tel.,* 535 F.2d 1356, 1358 (2d Cir. 1976); *Sonesta International Hotels Corp. v. Wellington Associates,* 483 F.2d 247, 250 (2d Cir. 1973) (emphasis in original). There is no doubt that the balance of hardships in this case tips decisively in favor of the participants in the temporary release program. While the Department of Correctional Services would of course be confronted with a significant administrative burden if prerevocation hearings are required in the case of these plaintiffs,[5] that hardship cannot be equated with the plaintiffs' continuing loss of the substantial freedom and range of opportunity which they enjoyed before the August pullback, and of which they have been deprived not because of fault but be-

cause of a restructuring of the statute. An injunction may not be granted, however, unless plaintiffs also raise questions which are sufficiently serious to create "a fair ground for litigation." This condition requires analysis of the merits of their case.

## II.

■■ Plaintiffs argue that the Due Process Clause of the Fourteenth Amendment protects them against removal from the temporary release program without a prior hearing. Two factors govern the determination whether due process calls for a hearing: whether plaintiffs have suffered a "grievous loss" of a liberty or property interest, *Morrissey v. Brewer, supra,* 408 U.S. at 481, 92 S.Ct. 2593; *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, Jr., concurring), and whether they have an "entitlement" to this liberty or property interest arising out of federal or state law or practice. *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); *Montanye v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976).

### A. *Grievous Loss*

■■ Plaintiffs analogize removal from a temporary release program to parole revocation and to loss of conditional release rights, which are well-recognized to constitute grievous losses of liberty, meriting due process protection under the Fourteenth Amendment. *Morrissey v. Brewer, supra,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484;

were received from the superintendent of each release facility; and (4) the Central Office made an overall review in order to reach a final determination. (Affidavit of Commissioner Lewis L. Douglass at 3) In other words, the reasons for removal were based only in part on the factors set out in the amended statute.

4. Plaintiffs ask that their hearings include the right to counsel or counsel-substitute, the right to call witnesses, the right to confront and cross-examine adverse witnesses, and the right to present a meaningful defense. (Complaint at 13)

5. The state argues that if a hearing were required prior to each revocation, the statutory goal of providing speedy removal from the pro-

gram of all inmates representing a danger to the community would be frustrated. (Affidavit of Commissioner Lewis L. Douglass at 4–5) Our decision is addressed only to the 140 inmates who have brought this action, and there is no reason why granting these individuals hearings need interfere in the future with the Department's ability to implement the statutory intent. The Department can avoid the present dilemma easily enough by making it clear to future participants both in the agreement and verbally—and in practice where necessary—that their participation may be revoked for literally any reason. If this were done, it would prevent an entitlement from coming into existence.

*United States ex rel. Bey v. Connecticut,* 443 F.2d 1079 (2d Cir. 1971); *Zurak v. Regan,* 550 F.2d 86 (2d Cir. 1977). The argument runs that, like parolees, temporary release participants enjoy a form of conditional liberty: they may spend up to fourteen hours a day outside prison, participating in employment or schooling. Indeed, the very purpose of temporary release is to lessen the shock of returning to society by offering much of the freedom of parole. While the temporary release participant, unlike a parolee, must normally return to his work release facility at night, even this distinction is not overwhelming since overnight and weekend furloughs are commonly available. Plaintiffs also compare their loss to impairment of the interest in conditional release, which was held in *Zurak v. Regan, supra,* 550 F.2d 86, to require due process protection. *Zurak* and the parole revocation cases, plaintiffs argue, establish that a broad range of interests in conditional liberty are entitled to the safeguards of the Fourteenth Amendment.

■ The comparison between these forms of conditional freedom is persuasive. However, plaintiffs are not limited to analogy in establishing that the magnitude of harm resulting from loss of temporary release status is enough to invoke due process. This Circuit has already held that inability even to commence participation in such a program works a grievous loss. In *Cardaropoli v. Norton,* 523 F.2d 990 (2d Cir. 1975), an inmate contested his classification, without formal notice or explanation, as a special offender, a classification which made him ineligible to apply for certain rehabilitative programs, including work release. The Court of Appeals held that such ineligibilities constituted a grievous loss requiring at least the basic elements of due process. This decision finds recent support in the Seventh Circuit's holding in *Holmes v.*

*United States Board of Parole,* 541 F.2d 1243 (7th Cir. 1976), in which the classification of an inmate as a special offender without a prior hearing was invalidated on the reasoning of *Cardaropoli.* The *Holmes* court held further that the Supreme Court's ruling in *Meachum, supra,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (which followed *Cardaropoli* by a year) did not require a different disposition.

*B. Entitlement*

In *Meachum v. Fano, supra,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451, the Supreme Court held that sufferance of a grievous loss does not, alone, compel the application of the Due Process Clause, but that some right or expectation rooted in state law must protect an individual against such a loss. Fano was a prisoner who sued to invalidate his transfer from a medium to a maximum security prison without a due process hearing. Granting that Fano's transfer might constitute a grievous loss, the Court held that he could nevertheless be transferred without a hearing because no state statute or practice had endowed him with an entitlement to remain in a particular type of penal facility or not to be transferred without a hearing.

Relying on *Meachum,* the state argues that, even if removal from the temporary release program is determined to be a grievous loss, the Due Process Clause is inapplicable since no constitutional or statutory right exists to participate in the program. In particular, the state points to language in both § 853(8) of the Correction Law which governs the temporary release program[6] and the form agreement signed by each enrolling participant which specifies that participation is a privilege which may be revoked at any time. Plaintiffs respond that whether an entitlement has been created must be determined by look-

6. § 853(8) reads:

"Participation in a temporary release program shall be a privilege. Nothing contained in this article may be construed to confer upon any inmate the right to participate, or to continue to participate, in a temporary release program. The superintendent of the institution may at any time, and upon recommendation of the temporary release committee or of the commissioner or of the chairman of the state board of parole or his designee shall, revoke any inmate's privilege to participate in a program of temporary release."

ing to the reasonable expectation of the inmate based on a variety of factors, including not only the statute and regulations, but also history and prior practice.[7] Two factors in this case, the wording of the form agreement and official policy concerning removal, persuade us that a reasonable person, once accepted, would expect to be allowed to continue in the program unless by his own conduct he gave cause for removal.

 The state's dependence on the statutory language is unpersuasive if only because it is unreasonable to assume, or to believe, that a prisoner will know the language of a statute—even of a statute dealing with a subject so dear to his heart as temporary release, and even in this day of jail-house lawyers. Nor is this a sector of the law in which the principle of constructive knowledge is fairly applicable.

The state is on stronger ground in arguing that a prisoner is chargeable with knowledge of the wording in the agreement he signs and of prison procedure governing revocation of temporary release status. The wording of the program memorandum, signed by each participant, states as follows:

"I accept the foregoing program and agree to be bound by the terms and conditions thereof. I understand that I will be under the supervision of the state department of correctional services while I am away from the premises of the institution and I agree to comply with the instructions of any parole officer or other employee of the department assigned to supervise me. *I understand that my participation in the program is a privilege which may be revoked at any time, and that if I violate any provision of the program I may be taken into custody by any peace officers and I will be subject to disciplinary procedures.* (emphasis added)

 It is true that the agreement read literally provides that "participation in the program is a privilege which may be revoked at any time." However, literalness is not enough. A more natural reading of the agreement when read in context, as it must be, is that removal is not discretionary but occurs only following one of the specific acts listed earlier in the agreement, that is rejecting departmental supervision, disobeying the instructions of prison officials, or violating some other provision of the program. Moreover, the practice of the state since initiation of the program has actually been to revoke temporary release status only upon a showing of misbehavior. (Plaintiffs' Memorandum at 20–21) These factors establish, and we find that, a participant did have a reasonable expectation, arising from the practice of the state itself, of a right to continued participation in the program so long as he did not commit an offense within the letter or spirit of the agreement and that he cannot be deprived of this entitlement without appropriate and due process. Indeed, as Commissioner Lewis L. Douglass himself stated to the court with commendable candor (at argument of this motion on the record), prior to the

---

**7.** There is little case law since the recent decision in *Meachum, supra,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451, explaining how an entitlement is created. Plaintiffs rely on the approach taken in *Meachum* itself, in which the Supreme Court referred to *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), as providing an example of a state-created entitlement. In *Wolff,* the court looked to the entire state scheme of state statutes and prison regulations in determining that the structure and history of good time accreditation entitled prisoners to a due process hearing before revocation of such a credit. Plaintiffs also cite decisions by two Courts of Appeals in support of the argument that the manner in which a program is administered can create an entitlement even when the governing statute does not. *Zurak v. Regan,* 550 F.2d 86 (2d Cir. 1977); *Walker v. Hughes,* 558 F.2d 1247 (6th Cir. 1977). In *Zurak,* the court found that New York penal law created a justifiable expectation that inmates would be conditionally released if they met Parole Board standards. This decision was made despite language in the statute making release discretionary (New York Correction Law § 827), indicating that the court looked to regulations and practice in concluding that an entitlement existed. In *Walker, supra,* 558 F.2d 1247, 1255, the court stated explicitly that "rules and mutually explicit understandings" were to be considered in determining whether a liberty interest, protected by the Fourteenth Amendment, was created.

statute's amendment it had been the expectation of the Department as well as the inmates that participants would continue in the program absent a specific violation.

This analysis is supported by the recent decision in *Holmes v. United States Board of Parole, supra,* 541 F.2d 1243, which held after *Meachum,* that due process hearing rights do attach to classification as a special offender. The *Holmes* court reconciled its holding with *Meachum* on the ground that established prison policy created an entitlement to apply for rehabilitative programs:

> "While there may exist no right to furlough or parole as there exists no right to incarceration in a particular prison, *the extension to prisoners by established prison policy of the opportunities of parole and furlough, constitutes a cognizable benefit to prisoners.* No such cognizable benefit was bestowed upon the prisoners in *Meachum* or *Montayne* and we do not read those cases to eliminate due process where cognizable benefits have been established by prison policy . . ."
> (emphasis added).

### III.

■ In sum, we find that revocation of participation in the temporary release program constitutes grievous loss in regard to an entitlement and therefore may not occur without a hearing in accordance with appropriate and due process. It remains to determine the scope of due process appropriate in the circumstances. *Morrissey v. Brewer, supra,* 408 U.S. at 481, 92 S.Ct. 2593; *Goldberg v. Kelly,* 397 U.S. 254, at 262–63, 90 S.Ct. 1011, 25 L.Ed.2d 287; *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). That question will be disposed of hereafter upon further conference with the litigants.

■ In the meantime, the defendants are ordered to reinstate the members of the plaintiff class (other than those persons alleged to have been convicted of escaping or absconding or whose next Parole Board appearance will occur later than September 2, 1978) to the temporary release program, and the defendants, their employees and agents are enjoined from removing such persons from the temporary release program except under the same terms and conditions upon which removals were made immediately prior to the removal of the members of the plaintiff class in August, 1977.

The effect of this order is stayed until 5:30 P.M. October 19, 1977.

### On Motion to Alter or Amend

■ The defendants move to alter or amend our decision and order of October 14, 1977. They contend that even if the plaintiffs have an entitlement to participate in the temporary release program, the court should, at the least, balance the rights accruing under that entitlement against the "security" needs of the community. No one can reject cavalierly a suggestion that the security of the community may be jeopardized by a particular decision. Nevertheless, the argument remains less than persuasive. It cannot carry the day because plaintiffs' entitlement in this case came into existence only after a security check at the time each plaintiff was originally admitted to the program and no showing has been made of any change in facts which warrants the withdrawal of a right conferred on the basis of the earlier security check. The situation may be best understood by analogizing it to that of a parolee. Parole, once granted, cannot be revoked by an assertion of the parole board, at a later date, that its earlier decision was unsound or incorrect. *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

■ These observations compel the conclusion that none of the members of the plaintiff class may be removed from the temporary release program on allegations that their participation would constitute a threat to the security of the community except upon a showing, in accordance with due process, that a change of facts has occurred since the original determination permitting the inmate's participation, or the discovery by the defendants of new relevant facts which, although they existed at

the time of the original decision, were unknown to the defendants through no fault of their own and through no lack of reasonable diligence on their part. As to any inmate alleged to be a security risk under such circumstances, he shall be restored to the temporary release program unless within twenty days from the filing of this order the charges against him are heard and determined in accordance with the requirements for hearings at correctional institutions set forth in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

It is so ordered.