**Thomas John KLOS, Plaintiff–Appellant,**

v.

**Thomas HASKELL, Superintendent, Monterey Shock Incarceration Correctional Facility, Cheryl Clark, Director of Shock Development, New York State Department of Correctional Services, Philip Coombe, Jr., First Deputy Commissioner, New York State Department of Correctional Services, and Thomas Coughlin, Commissioner, New York State Department of Correctional Services, Defendants–Appellees.**

No. 684, Docket 93–2666.

United States Court of Appeals, Second Circuit.

Argued Nov. 21, 1994.

Decided Feb. 10, 1995.

82

Paola M.G. De Kock, New York City (Mitchell A. Lowenthal, Cleary, Gottlieb, Steen & Hamilton, of counsel), for plaintiff-appellant.

Troy J. Oechsner, Asst. Atty. Gen., Albany, NY (G. Oliver Koppell, Attorney General, Peter H. Schiff, Deputy Sol. Gen., Peter G. Crary, Asst. Atty. Gen., of counsel), for defendants-appellees.

Before: OAKES, JACOBS and CALABRESI, Circuit Judges.

OAKES, Senior Circuit Judge:

The issue raised by this appeal is whether a Fourteenth Amendment liberty interest is violated by a prison inmate's unexplained removal from New York State's Shock Incarceration Program, N.Y. Correct.Law art. 26-A (McKinney Supp.1995) (the "shock program"), and his return to the general inmate population. Thomas John Klos, formerly a participant in the shock program, appeals from the September 17, 1993 judgment of the District Court for the Western District of New York, Michael A. Telesca, *Judge,* 835 F.Supp. 710 (W.D.N.Y.1993), adopting the

report and recommendation of Kenneth R. Fisher, *Magistrate Judge*, granting defendants' motion for summary judgment, denying Klos's motions for partial summary judgment and for various other relief, and dismissing Klos's complaint under 42 U.S.C. § 1983 (1988). We hold that, in light of the broad discretion which the legislature has conferred on shock program officials, no enforceable liberty interest was violated. Accordingly, we affirm.

### BACKGROUND

In 1990, Klos was convicted by a New York state jury of burglary and criminal mischief, for which he was given concurrent sentences of from two to six years and from one to three years, respectively. On December 28, 1990, Klos was transferred from the Downstate Correctional Facility to the Lakeview Shock Incarceration Correctional Facility. Over the following week, Klos was screened and accepted for participation in the shock program, and shortly thereafter he began a six-month program at the Monterey Shock Incarceration Facility operated by the New York State Department of Correctional Services.

The shock program, created by the New York legislature in 1987, provides a six-month voluntary alternative to traditional incarceration for selected youthful, nonviolent offenders. Modelled after military "boot camps," the highly structured, rigorous program is intended to instill a sense of discipline and responsibility in participating inmates. In exchange for successful completion of the program, an inmate becomes eligible for early release on parole. *See generally* N.Y.Correct.Law art. 26–A (McKinney Supp.1995); N.Y.Comp.Codes R. & Regs. ("N.Y.C.C.R.R.") tit. 7, part 1800 (1989).[1] As the regulations explain, the program provides

> a highly structured routine of discipline, intensive regimentation, exercise and work therapy, together with substance abuse workshops, education, prerelease counsel-

ing and self-improvement counseling. If an inmate successfully completes the shock incarceration program, he or she will be eligible for parole release and will be awarded a certificate of earned eligibility....

7 N.Y.C.C.R.R. § 1800.2.

Inmates seeking to enter the program must apply to the shock incarceration screening committee, which reviews the applicant's suitability for the program and forwards a recommendation to the Commissioner of Correctional Services (the "Commissioner") for his approval or disapproval. N.Y.Correct.Law § 867.2. Once admitted to the program, participants, in addition to following a highly structured intensive regimen, must agree to give up privileges enjoyed by the prison population as a whole. Specifically, visits, religious services, commissary privileges, and recreational activities are curtailed, packages are not permitted, personal property is limited, and the wearing of jewelry is forbidden. 7 N.Y.C.C.R.R. § 1800.9. In addition, program participants must obey detailed regulations on personal grooming, including the length of their hair, the type of clothing to be worn, and even the contents of their pockets. *Id.* § 1800.8.

Before being transferred to a shock facility, each inmate must sign a "Memo of Agreement" outlining the terms and conditions of participation in the program. *Id.* § 1800.9. The Memo concludes with the following paragraph:

> I accept the foregoing program and agree to be bound by the terms and conditions thereof. *I understand that my participation in the program is a privilege that may be revoked at any time at the sole discretion of the Commissioner.* I understand that I must successfully complete the entire program to obtain a certificate of earned eligibility upon the completion of said program, and in the event that I do not successfully complete said program, for any reason, I will be returned to a non-

---

1. 7 N.Y.C.C.R.R. § 1800.10(a), which concerns the Commissioner's discretion to remove an inmate from the shock program, was amended subsequent to the events in issue in this appeal.

*See id.* (1994). Consequently, we apply the regulations as they existed in 1990, at the time of Klos's removal from the shock program.

shock incarceration correctional facility to continue service of my sentence.

N.Y.Correct.Law § 867.3; 7 N.Y.C.C.R.R. § 1800.9(b) (emphasis added). The above-emphasized language mirrors other language in the statute and regulations. *See* N.Y.Correct.Law § 867.5 ("Participation in the shock incarceration program shall be a privilege. Nothing contained in this article may be construed to confer upon any inmate the right to participate or continue to participate therein.").

On January 7, 1991, Klos signed the shock program Memo of Agreement. On January 29, 1991, he was transferred from the Lakeview shock facility to the Monterey shock facility. On April 4, 1991, after completing approximately one-third of the program term, Klos was summarily removed from the shock program, without an explanation, and transferred to the Elmira Correctional Facility.

Defendants did not contend at the time, and have not contended since, that Klos's participation in the shock program was unsatisfactory in any way. They gave no explanation for Klos's transfer, indeed, until after Klos had filed this action and defendants had moved for summary judgment. Defendants now explain that Klos was transferred in response to a letter dated March 27, 1991, sent to defendant Thomas A. Coughlin III, the Commissioner of Correctional Services, by the Nassau County District Attorney, Denis Dillon, objecting to Klos's participation in the program.

In the letter, Dillon objected that Klos's early release—upon completion of the shock program, he would be eligible for parole by July 1991—would present a danger to the community. The crime for which Klos was convicted, Dillon alleged, "was by no means an isolated criminal act," but rather was "part of a score of arsons and burglaries that destroyed three schools and several small businesses on the south shore of Nassau County between June and August of 1989." Letter from Dillon to Coughlin of March 27, 1991, at 1. Dillon's letter sets out in detail a series of allegations regarding these "crimes," without alleging that Klos was ever charged, much less convicted, for any of

them. The letter makes reference as well to Klos's "career as a juvenile delinquent in Family Court," information about which "is, of course, not available to us." *Id.* It notes as well that "Klos's accomplices were themselves chronic offenders who engaged in devil-worship, church vandalism, and on one notable occasion, the desecration of a grave." *Id.* at 1–2. The letter concludes with a characterization of Klos as a "sociopathic, amoral and anti-social ... atavistic, vengeful, and violent young man who espouses survivalism, and is incapable of interacting in a normal manner with family, friends or society at large." *Id.* at 2. It recommends that, in view of the danger that Klos poses to society, Klos be removed from the shock program and remitted to a maximum security facility.

On April 4, 1991, Coughlin wrote back to Dillon to inform him that, after reviewing Klos's record, he determined that "although the crimes of conviction do not preclude participation in the Department's Shock Incarceration program, there is sufficient material in Mr. Klos's record to convince me that he is not a suitable candidate for the program." Letter from Coughlin to Dillon of April 4, 1991. The letter noted that "Mr. Klos is no longer in the Shock Incarceration program" and that accordingly he would be required to serve his full minimum term (two to six years) before becoming eligible for parole. That same day, Klos was transferred out of the Monterey shock program into the Elmira Correctional Facility.

On March 16, 1992, Klos brought a *pro se* action pursuant to 42 U.S.C. § 1983, seeking damages and declaratory and injunctive relief on the ground that his removal from the shock program without notice, explanation, or a hearing violated his due process rights. Klos served interrogatories on defendants on September 23, 1992, seeking information about the reasons for his removal in particular and about the admissions and removal practices of shock program officials in general. On October 29, he filed a motion to compel answers to his interrogatories. Rather than respond to Klos's interrogatories, defendants moved for summary judgment on October 30, 1992 and sought a stay of discovery pending determination of their motion.

Klos cross-moved for partial summary judgment. Additionally, he served a second set of interrogatories, identical to the first, along with an affidavit explaining why he needed answers to his interrogatories in order to oppose defendants' summary judgment motion. He moved again for an order to compel answers to his interrogatories and attached a set of "requested answers," which he asked the court to deem as true in the event that defendants did not respond to his interrogatories.

On May 10, 1993, Magistrate Judge Fisher issued a report and recommendation (the "Report"), recommending that defendants' motion for summary judgment be granted and that Klos's motions for partial summary judgment, for discovery relief, and for various other forms of relief be denied. See Klos v. Haskell, 835 F.Supp. 710 (W.D.N.Y.1993) (opinion of Telesca, J., adopting magistrate judge's Report). The magistrate judge, first, denied as moot Klos's motions to compel defendants to answer his interrogatories. Id. at 717–18. He treated these motions as requests, pursuant to Rule 56(f), to hold the motions for summary judgment in abeyance until discovery was complete. The magistrate judge reasoned (1) that Klos had failed to explain how the facts sought would create a genuine issue of material fact, as we have required under Rule 56(f), see Burlington Coat Factory Warehouse Corp. v. Esprit De Corp., 769 F.2d 919, 926 (2d Cir.1985); and (2) that, by filing a cross-motion for summary judgment, Klos "implicitly acknowledged that there are no material issues of fact to be litigated." 835 F.Supp. at 718.

Turning to the merits of Klos's due process claim, the magistrate judge concluded that, in light of New York's shock incarceration statute and regulations, Klos had no liberty interest in remaining in the shock program and so his removal from the program could not have constituted a deprivation of due process. The magistrate judge determined, first, that the statute and regulations do not limit the Commissioner's discretion in approving or disapproving inmate applications to enter the program. Id. at 721–23. Second, once an inmate is enrolled, the magistrate judge concluded, the Commissioner is given unlimited discretion to remove an inmate from the program at any time. Id. at 723–24. Thus, Klos's interest in early release upon completion of the shock program "may thus be deemed an expectancy interest ... rather than a promise of early release," and is accordingly not protected by the Due Process Clause. Id. at 725. Having dismissed the complaint on this ground, the magistrate judge found it unnecessary to determine whether the defendants possessed qualified immunity. Id. at 726.

Klos filed timely objections to the magistrate judge's Report. Discovery was essential, he contended, for him to demonstrate that, as a matter of practice, participants had a reasonable expectation that they would not be removed from the program absent a rule violation and that they would receive parole upon completion of the program. He alleged, in addition, that the prosecutor's letter that prompted his removal from the program contained many inaccuracies, which he had been given no opportunity to contest. He filed two affidavits stating that he had been able to obtain only partial information about the program and was still lacking crucial facts. The district court adopted the magistrate judge's Report by order dated September 17, 1993, and judgment was entered dismissing the case.

## DISCUSSION

On appeal, Klos, now represented by counsel, does not seriously challenge the district court's conclusion that New York's statutory and regulatory scheme confers broad discretion on the Commissioner to decide which inmates may be admitted to, or remain in, the program. Rather, he contends that unresolved factual questions about the practices of prison officials in administering the program raised material issues which made summary judgment premature. In particular, he contends, prison officials' practice of promising program participants early release on parole in exchange for completion of the program conferred a legitimate expectation of conditional release on participants. Cf. Tracy v. Salamack, 440 F.Supp. 930, 935 (S.D.N.Y.1977) (holding that inmates had "a reasonable expectation, arising from the

practice of the state itself," of continued participation in a prison temporary-release program, despite statute and memorandum, signed by participants, stating that participation was a privilege that could be revoked at any time), *modified,* 572 F.2d 393 (2d Cir.1978) (per curiam).

Klos alleged the existence of such a practice in his affidavits. He alleged, additionally, that prison officials regularly promised participants that they would be able to remain in the program so long as they complied with the programs' rigorous requirements, and he proffered evidence of at least one statement to this effect. *See* Plaintiff's Affidavit in Support of Objections to Report and Recommendation, ex. B (letter of Cheryl L. Clark, Director of Shock Development, to John Budnick, Klos's counsel in state court, dated June 15, 1993, noting that "inmates remain in the program as long as they meet all standards"). Klos sought discovery to gather additional evidence that prison officials have regularly made such representations to participants and that they have acted in accordance with those representations, allowing shock program participants to complete the program and earn a certificate of earned eligibility if they complied with the program's requirements.

Defendants respond that where, as here, the governing statutes and regulations confer absolute discretion on prison officials to transfer an inmate, no practices by prison officials can confer a liberty interest in avoiding such transfer.

We find defendants' characterization of the law too sweeping. Nevertheless, we conclude that, in light of the broad discretion which the New York statute and regulations confer on the Commissioner, Klos's allegations of state practices are insufficient as a matter of law to create an enforceable liberty interest. Because we conclude that additional discovery would not disturb this result, we need not consider the legitimacy of the magistrate judge's reasons for cutting off discovery.

■ Liberty interests protected by the Fourteenth Amendment may arise directly from the Due Process Clause itself or from the laws of the states. *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 1908, 104 L.Ed.2d 506 (1989); *Hewitt v. Helms,* 459 U.S. 460, 466, 103 S.Ct. 864, 868, 74 L.Ed.2d 675 (1983). However, "lawfully incarcerated persons retain only a narrow range of protected liberty interests." *Helms,* 459 U.S. at 467, 103 S.Ct. at 869; *see also Hernandez v. Coughlin,* 18 F.3d 133, 136–37 (2d Cir.1994). Thus, the Court has held that an inmate has no inherent liberty interest in commutation of his sentence, *Connecticut Bd. of Pardons v. Dumschat,* 452 U.S. 458, 464, 101 S.Ct. 2460, 2464, 69 L.Ed.2d 158 (1981); in being paroled, *Greenholtz v. Inmates of Neb. Penal & Correctional Complex,* 442 U.S. 1, 7, 99 S.Ct. 2100, 2103–04, 60 L.Ed.2d 668 (1979); in receiving good-time credit for satisfactory behavior while in prison, *Wolff v. McDonnell,* 418 U.S. 539, 557, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974); in remaining in one correctional institution rather than another, *Olim v. Wakinekona,* 461 U.S. 238, 248, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983); *Meachum v. Fano,* 427 U.S. 215, 225, 96 S.Ct. 2532, 2538–39, 49 L.Ed.2d 451 (1976); or in avoiding "administrative" (nonpunitive) segregation from the general prison population, *Helms,* 459 U.S. at 468, 103 S.Ct. at 869–70. *Cf. Vitek v. Jones,* 445 U.S. 480, 491–94, 100 S.Ct. 1254, 1263–64, 63 L.Ed.2d 552 (1980) (holding that prisoner retained a "residuum of liberty" that was infringed by his summary transfer to a mental hospital).

Klos, of course, does not contend that he has an inherent right to remain in the shock program. Rather, he contends that New York, by promising participants in its shock program that their successful completion of the program will lead to their early release, has conferred an enforceable liberty interest on those participants.

■ A state may confer enforceable liberty interests on prisoners through its enactment of statutory or regulatory measures which place substantive limitations on prison officials' discretion. *See, e.g., Helms,* 459 U.S. at 469–72, 103 S.Ct. at 870–72 (liberty interest in avoiding administrative confinement was created by state law); *Greenholtz,* 442 U.S. at 12, 99 S.Ct. at 2106 (liberty

interest created in early parole); *Wolff*, 418 U.S. at 556–58, 94 S.Ct. at 2974–76 (liberty interest created in retaining good-time credits); *Gittens v. LeFevre,* 891 F.2d 38 (2d Cir.1989) (liberty interest created in avoiding "keeplock" confinement).

For a liberty interest to be conferred by the state, two requirements must be met: (1) the state must have articulated specified "substantive predicates" which limit the discretion of state officials; and (2) it must have employed "explicitly mandatory language," requiring state officials to follow those substantive predicates. *See Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 462–63, 109 S.Ct. 1904, 1909–10, 104 L.Ed.2d 506 (1989); *Helms,* 459 U.S. at 466, 103 S.Ct. at 868; *Wright v. Smith,* 21 F.3d 496, 498 (2d Cir.1994); *Purnell v. Lord,* 952 F.2d 679, 684 (2d Cir.1992); *Gittens,* 891 F.2d at 40.

We note initially that the situation of an inmate who is removed from a shock incarceration program must be distinguished from that of one who is involuntarily transferred from one prison institution to a comparable one. As the Court has stated, "[t]he deprivations imposed in the course of the daily operations of an institution"—including those imposed by transfer or administrative segregation—"are likely to be minor when compared to the release from custody at issue in parole decisions and good-time credits." *Helms,* 459 U.S. at 470, 103 S.Ct. at 870. While prison administrators of necessity retain broad discretionary authority over the day-to-day administration of the prisons, *id.* at 467, 470, 103 S.Ct. at 869, 870, their actions may be scrutinized more closely when they have the potential effect of reducing the amount of time which an inmate will spend in custody or of "radically transform[ing] the nature of the custody to which the inmate [is] subject." *Id.* at 469–70, 103 S.Ct. at 870.

The facts of this case must also be distinguished from cases in which prisoners have unsuccessfully claimed a liberty interest in their expectation of early parole or of commutation of their sentence. *See Dumschat,* 452 U.S. at 464, 101 S.Ct. at 2464 (noting the Court's identification, in *Greenholtz,* 442 U.S. at 9–11, 99 S.Ct. at 2104–06, of a "critical" difference between denial of an initial grant

of parole or commutation, which is "rarely" subject to judicial review, and revocation of parole once it has been granted). This case falls somewhere between the two sides of this equation—between denial of a "unilateral hope" of early conditional release (which does not implicate a liberty interest, *see Dumschat,* 452 U.S. at 465, 101 S.Ct. at 2464–65) and revocation of already-granted release status (which does, *see Morrissey v. Brewer,* 408 U.S. 471, 482, 92 S.Ct. 2593, 2600–01, 33 L.Ed.2d 484 (1972) (revocation of parole), and *Gagnon v. Scarpelli,* 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973) (revocation of probation)). Klos contends that, once he had been admitted into the shock program, he possessed more than a "unilateral hope" of liberty; he possessed a *"justifiable expectation," Washington v. Harper,* 494 U.S. 210, 221, 110 S.Ct. 1028, 1036, 108 L.Ed.2d 178 (1990) (emphasis added), *of liberty upon the completion of specified requirements.*

Whether Klos's expectation was "justifiable," of course, depends on the statute, regulations, and practice of New York State concerning the rights of inmates within the program, and an examination of the statute and regulations makes clear that it was not.

First, as the magistrate judge noted, 835 F.Supp. at 721–23, the statute and regulations place no limit on the Commissioner's decision to approve or disapprove an inmate's application for enrollment in the shock program. While a screening committee must review the inmate's application to determine whether the "inmate's participation in the shock incarceration program is consistent with the safety of the community, the welfare of the applicant and the rules and regulations of the department," N.Y.Correct.Law § 867.2, and while the committee, if it finds the application in compliance with these requirements, "shall forward the application to the commissioner or his designee for approval or disapproval," *id.,* the statute is entirely silent on how the Commissioner is to exercise his discretion in approving or disapproving the forwarded application.

Second, the statute and regulations make clear that, once an inmate has been admitted

into the shock program, he is entitled to no legitimate expectation that he will continue in and complete the program, regardless of his full compliance with program rules. The statute states this expressly:

Participation in the shock incarceration program shall be a privilege. Nothing contained in this article may be construed to confer upon any inmate the right to participate or continue to participate therein.

*Id.* § 867.5. To the contrary, "[a]ny inmate's privilege to continue to participate in the shock incarceration program may be revoked at the sole discretion of the commissioner...." 7 N.Y.C.C.R.R. § 1800.10(a). Program participants are notified unequivocally of the Commissioner's "sole discretion" to revoke their participant status, through the Memo of Agreement which they are required to sign before enrolling. *See* N.Y.Correct.Law § 867.3; 7 N.Y.C.C.R.R. § 1800.9(b) (stating "I understand that my participation in the program is a privilege that may be revoked at any time at the sole discretion of the commissioner."). Klos signed such an agreement before entering the program.

In light of this explicit statutory scheme, and in light of the Memo of Agreement which Klos signed, no reasonable factfinder could conclude that the alleged promises by prison officials—to the effect that participants who followed program rules could expect to complete the program and earn a certificate of earned eligibility—conferred an enforceable liberty interest on shock program participants. In reaching this conclusion, we do not rule out the possibility that, under other circumstances, certain practices or promises of state officials, when advanced in the context of state statutes or regulations that are equivocal concerning the extent of discretion afforded prison authorities, might meet the requirements of *Thompson* and *Helms* and allow a court to find that the law of the state established a liberty interest. *See Vitek v. Jones,* 445 U.S. 480, 489–90, 100 S.Ct. 1254, 1261–62, 63 L.Ed.2d 552 (1980) (finding a liberty interest arising from plaintiff's "objective expectation, firmly fixed in state law and *official Penal Complex practice* " (emphasis

added) (internal quotation omitted)); *see, e.g., Dumschat,* 452 U.S. at 467, 101 S.Ct. at 2465–66 (Brennan, *J.,* concurring) (liberty interest may be derived "by reference to statute, regulation, *administrative practice,* contractual arrangement *or other mutual understanding* ") (emphasis added). However, this cannot be the case where, as here, the arguably "mandatory language," *Thompson,* 490 U.S. at 463, 109 S.Ct. at 1910, of prison officials' promises is expressly contradicted by the statute's grant of "sole discretion" in prison authorities and where the extent of this discretion is communicated unequivocally, in writing, to program participants. *Cf. Tracy v. Salamack,* 440 F.Supp. 930, 935 (S.D.N.Y.1977) (prisoner memorandum was ambiguous in conveying extent of prison officials' discretion), *modified,* 572 F.2d 393 (2d Cir.1978) (per curiam). Under such circumstances, we must conclude, the alleged promises by shock program officials are not the kind of promises "that an inmate could reasonably expect to enforce ... against the prison officials." *Thompson,* 490 U.S. at 465, 109 S.Ct. at 1911.

This conclusion is reinforced when we examine the other prong of the *Thompson* test for creation of a liberty interest—that the state must have articulated "specified substantive predicates" which limit the discretion of state officials. *Id.* at 462, 109 S.Ct. at 1909. No liberty interest has been created where, as here, the inmate cannot show "that particularized standards or criteria guide the State's decisionmakers." *Olim v. Wakinekona,* 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983) (quoting *Dumschat,* 452 U.S. at 467, 101 S.Ct. at 2465 (Brennan, *J.,* concurring)); *Hall v. Unknown Named Agents,* 825 F.2d 642, 645 (2d Cir.1987); *Gill v. Mooney,* 824 F.2d 192, 194 (2d Cir.1987); *cf. Sher v. Coughlin,* 739 F.2d 77, 81 (2d Cir.1984) (holding that no liberty interest was impaired by placement in restrictive confinement when the applicable regulation accorded officials "unfettered discretion").

While the shock program regulations do provide for admissions criteria and procedures to be followed by the shock incarceration selection committee, 7 N.Y.C.R.R. §§ 1800.3, 1800.4, and for procedures to be

followed by the superintendent's committee in recommending removal for misbehavior, *id.* § 1800.10(b), (c), these procedures do not bind the Commissioner, who retains sole discretion to approve an applicant for admission or to remove an inmate from the program at any time. *See id.* §§ 1800.3(c), 1800.10(a); *and see Klos,* 835 F.Supp. at 721–23 (Commissioner's sole discretion regarding admission); *id.* at 723 (Commissioner's discretion to remove an inmate from the program). Thus, despite the alleged promises by program officials, the statute and regulations make clear that, as in *Olim* and *Dumschat,* the Commissioner "is not 'required to base [his] decisions [to admit or to transfer a participant] on objective and defined criteria,' but instead 'can deny the requested relief for any constitutionally permissible reason or for no reason at all.'" *Olim,* 461 U.S. at 249, 103 S.Ct. at 1747 (quoting *Dumschat,* 452 U.S. at 467, 101 S.Ct. at 2466 (Brennan, J., concurring)).

## CONCLUSION

For the reasons set forth above, we conclude that Klos did not have an enforceable liberty interest in remaining in the shock program. Accordingly, the judgment of the district court dismissing the case as a matter of law is affirmed.

JACOBS, Circuit Judge, concurring:

I concur in the result and in the analysis that supports the result. I write separately because the opinion includes a passage of dictum that I think is doubtful.

The opinion correctly announces the controlling legal principle:

For a liberty interest to be conferred by the state, two requirements must be met: (1) the state must have articulated specified "substantive predicates" which limit the discretion of state officials; and (2) it must have employed "explicitly mandatory language," requiring state officials to follow these substantive predicates. *See Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 462–63, 109 S.Ct. 1904, 1909–10, 104 L.Ed.2d 506 (1989); *Helms,* 459 U.S. at 466, 103 S.Ct. at 868; *Wright v. Smith,* 21 F.3d 496, 498 (2d Cir.1994);

*Purnell v. Lord,* 952 F.2d 679, 684 (2d Cir.1992); *Gittens,* 891 F.2d at 40.

*Ante* at 87. Later, however, the opinion adumbrates the "possibility that, under other circumstances, certain practices or promises of state officials, when advanced in the context of state statutes or regulations that are equivocal concerning the extent of discretion afforded prison authorities," might suffice to create a liberty interest. *Ante* at 88. I am not convinced that this language is congruent with the controlling legal principle that decides this appeal. How can "practices or promises ... of state officials ... establish a liberty interest," if the creation of a liberty interest requires "explicitly mandatory language" requiring state officials to follow "articulated specified 'substantive predicates'"? Moreover, I think every grant of "discretion" is likely to be "equivocal" in one way or another.

The dictum is followed by a citation to Justice Brennan's concurrence in *Connecticut Bd. of Pardons v. Dumschat,* 452 U.S. 458, 467, 101 S.Ct. 2460, 2465–66, with a parenthetical suggesting that an "administrative practice" alone, or even a "mutual understanding", may suffice to create a liberty interest. *Ante* at 88. If that were the law, virtually every claim of a liberty interest would go to a jury, or at least full discovery, and the state legislatures would lose the ability to define or delimit the liberty interests of state inmates.

In any event, the circumstances presented on this appeal give us no occasion to consider what minimal requirements might suffice to create a liberty interest.