317 F.3d 194
 Simon ANDERSON, Plaintiff-Appellant,
v.
James F. RECORE, Director, Temporary Release Programs, Department of Correctional Services, Joseph Williams, Superintendent, Lincoln Correctional Facility, Johnella Hill, Sr. Counselor, Department of Correctional Services, Defendants-Appellees,
Glenn S. GOORD, Commissioner, New York State Department of Correctional Services, Defendant.
 No. 01-0161.
 United States Court of Appeals, Second Circuit.
 Argued: December 13, 2001.
 Decided: January 15, 2003.
 Supplemental Briefing Completed: April 24, 2002.
 
 Simon Anderson, pro se, New York, NY, Petitioner-Appellant (Daniel L. Greenberg, John Boston, Milton Zelermyer, The Legal Aid Society, Brooklyn, NY, on the supplemental brief).
 Daniel Chepatis (Michael S. Belohlavek, Deputy Solicitor General, Patrick J. Walsh, Assistant Solicitor General, Eliot Spitzer, Attorney General of the State of New York, on the brief), New York, NY, for Defendants-Appellees.
 Before: POOLER, SOTOMAYOR, and B.D. PARKER, JR., Circuit Judges.
 POOLER, Circuit Judge.
 
 
 1
 In 1978 we held that prison inmates in a temporary release program must receive a hearing prior to revocation of their release status. Tracy v. Salamack, 572 F.2d 393, 395-96 (2d Cir.1978) (per curiam). The district court, whose reasoning we adopted, found that plaintiffs satisfied both prongs of the test that determines whether the Due Process Clause requires a hearing. First, the prisoners demonstrated that they had suffered a grievous loss of liberty within the meaning of Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). Tracy v. Salamack, 440 F.Supp. 930, 933-34 (S.D.N.Y.1977). Next, as Meachum v. Fano, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), requires, plaintiffs showed a right or expectation "rooted in state law" that protected them against the loss. Tracy, 440 F.Supp. at 934-35.
 
 
 2
 Despite this precedent, defendants revoked Simon Anderson's long-term, full-time temporary release status in 1996 without giving him notice and without allowing him to attend the subsequent hearing. Anderson sued, and defendants moved for dismissal based on qualified immunity. Although the district court recognized that we had recently reaffirmed Tracy in Kim v. Hurston, 182 F.3d 113 (2d Cir.1999), it held that defendants were entitled to prevail because at the time they revoked Anderson's temporary release, Sandin v. Conner, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), placed Tracy's continuing validity in doubt.
 
 
 3
 We disagree, finding that Sandin did not place Tracy in doubt because Sandin reaffirmed the key principles underlying Morrissey and thus Tracy.
 
 BACKGROUND
 
 4
 Anderson is an inmate in the custody of the New York Department of Correctional Services ("DOCS"). In May 1995, Anderson began to participate in DOCS' Temporary Release/Work Release Program. For most of the period of Anderson's participation in work release, he worked for the Neighborhood Defender Service of Harlem. On June 5, 1996, DOCS confined Anderson to the Restriction Unit at Lincoln Correctional Facility ("Lincoln"). Eight days later, corrections personnel served Anderson with a misbehavior report based on an allegation of cocaine use. On June 14, 1996, a superintendent's hearing was held.[1] On June 19, 1996, Lincoln's temporary release committee held a hearing and revoked Anderson's temporary release status. Anderson did not receive notice of this hearing and was not present. Anderson contested the revocation in a proceeding brought pursuant to Article 78 of the New York Civil Practice Law and Rules. New York State Supreme Court Justice Emily Jane Goodman held that DOCS' failure to allow Anderson to be present at a hearing before revoking his temporary release status required her to vacate the temporary release committee's decision. Anderson v. Williams, 173 Misc.2d 65, 660 N.Y.S.2d 957, 959 (1997).[2] She further directed that the committee hold a hearing within ninety days. Id. On September 4, 1997, Anderson returned to the temporary release program.
 
 
 5
 On February 9, 1999, Anderson filed a civil rights complaint in the United States District Court for the Southern District of New York. He seeks damages for the fifteen months he spent in prison after his temporary release status was revoked. After Anderson filed an amended complaint, the defendants, all of whom are DOCS officials or employees, moved for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6). Defendants urged four bases for dismissal: Anderson had not yet served the individual defendants with copies of the amended complaint; he failed to exhaust his administrative remedies; the defendants were entitled to qualified immunity on the issue of whether Anderson had a liberty interest in his temporary release status; and Anderson did not allege Goord's personal involvement in any wrongdoing.
 
 
 6
 In a report and recommendation filed August 2, 2000, Magistrate Judge Henry Pitman recommended that the district court grant defendants' motion. Although the magistrate judge rejected defendants' service and exhaustion of remedies arguments, he found that Anderson had not adequately pleaded Goord's personal involvement and that the defendants were entitled to qualified immunity. Anderson v. Goord, 2001 WL 561227,*3-8 (S.D.N.Y. May 24, 2001). The judge's qualified immunity determination followed from his conclusion that Sandin v. Conner, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), cast doubt on an inmate's liberty interest in temporary release status, a doubt that was removed only by our decision in Kim v. Hurston, 182 F.3d 113 (2d Cir.1999). Id. at *5.
 
 
 7
 The district court accepted the magistrate judge's recommendation in its entirety, Anderson, 2001 WL 561227, at *1, and this timely appeal followed. Anderson questions only that part of the district court's judgment that finds the defendants are entitled to qualified immunity. Following oral argument, we appointed pro bono counsel and asked both parties to submit supplemental briefing on qualified immunity. We gratefully acknowledge the skillful efforts of pro bono counsel on Anderson's behalf.
 
 DISCUSSION
 I. Qualified immunity principles
 
 8
 When, as here, the district court resolves a qualified immunity issue on a motion to dismiss, we review the court's determination de novo, accept as true all the material allegations of the complaint, and draw all reasonable inferences in the plaintiff's favor. Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 250 (2d Cir.2001).
 
 
 9
 Defendants are entitled to qualified immunity "if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." Id. (internal quotation marks omitted). A right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) "a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful." Young v. County of Fulton, 160 F.3d 899, 903 (2d Cir.1998). "The question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in the defendant's position should know about the constitutionality of the conduct." McCullough v. Wyandanch Union Free Sch., 187 F.3d 272, 278 (2d Cir.1999).
 
 
 10
 Defendants concede that inmates had a clearly established right to a hearing prior to revocation of temporary release from 1978, when we decided Tracy v. Salamack, until June 1995, when the Supreme Court decided Sandin v. Conner. They also concede that this right again became clear after our 1999 decision, Kim v. Hurston. Because defendants' claim is that what once was clear in this circuit was made unclear by an intervening Supreme Court decision, we must decide whether Sandin placed Tracy "in any reasonable doubt." Bass v. Coughlin, 976 F.2d 98, 99 (2d Cir.1992) (per curiam) (holding that Supreme Court decisions allowing prison officials to "meet less exacting standards when a prisoner's interest in marrying, or attending religious ceremonies, or maintaining the length of his hair is to be balanced against interests of rehabilitation and prison security" did not undermine this court's holding "that prison officials must provide a prisoner a diet that is consistent with his religious scruples").
 
 II. The origins of Tracy
 
 11
 Tracy took root from Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), and Meachum v. Fano, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). Tracy v. Salamack, 440 F.Supp. 930, 933-35 (S.D.N.Y.1977), aff'd as modified, 572 F.2d 393 (2d Cir. 1978) (per curiam). In Morrissey, the Supreme Court found "that the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a `grievous loss' on the parolee and often on others." Morrissey, 408 U.S. at 482, 92 S.Ct. 2593. The Court emphasized that a parolee, unlike a prisoner, is free to seek gainful employment and to be with family and friends. Id. Weighing the interests of the state in returning a parolee who has violated the conditions of parole to prison against the parolee's liberty interest, the Court determined that the parolee must be accorded several rights before his parole status was definitively revoked. Morrissey, 408 U.S. at 483-89, 92 S.Ct. 2593. These rights included
 
 
 12
 (a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses ...; (e) a `neutral and detached' hearing body such as a traditional parole board...; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole.
 
 
 13
 Id. at 489, 92 S.Ct. 2593.
 
 
 14
 Morrissey was followed by Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), in which the Court considered a statutory scheme that gave prisoners a right to accrue good-time credit against their sentences. Wolff, 418 U.S. at 557, 94 S.Ct. 2963. Prisoners could lose this credit — and thus the probability of a shortened sentence — only for "serious misbehavior." Id. Because the statute created a liberty interest of "real substance" in good-time credits, the Court held that loss of the credits must be preceded by notice and a hearing. Id. at 557-58, 563-68, 94 S.Ct. 2963.
 
 
 15
 Two years later, the Court held that not every "grievous loss visited upon a person by the State is sufficient to invoke the procedural protections of the Due Process Clause." Meachum v. Fano, 427 U.S. 215, 224, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). Instead, the Meachum court required the inmate plaintiffs, who objected to their transfer without a hearing to a different prison, to identify a source for entitlement to the interest in state law. Id. at 226-28, 96 S.Ct. 2532.
 
 
 16
 Tracy combines the holdings of Morrissey and Meachum. In Tracy, we adopted the district court's rationale for holding that a prisoner had a liberty interest in temporary release that could only be terminated through notice and a hearing. Tracy, 572 F.2d at 396. By adopting the district court's rationale, we also adopted the district court's conclusion that the plaintiffs must establish that (1) they suffered a grievous loss of liberty and (2) they had an "entitlement to this liberty ... interest arising out of federal or state law or practice." Tracy, 440 F.Supp. at 933 (internal quotation marks omitted). The court found that plaintiffs' loss of temporary release status, which had allowed them to be in the community for a portion of the time while also spending some time in prison, constituted a grievous loss of liberty within the meaning of Morrissey. Id. at 934. It found an entitlement to continued temporary release status within the meaning of Meachum in the wording of an agreement plaintiffs signed and in the official policy of the state for implementing the temporary release statute. Id. at 935.
 
 
 17
 III. Hewitt's effect on due process analysis in prisoner cases
 
 
 18
 Hewitt v. Helms, decided in 1983, subtly altered the due process analysis for prisoners. The Hewitt court found a liberty interest in freedom from administrative segregation without finding that confinement in administrative segregation constituted a grievous loss of liberty. Hewitt v. Helms, 459 U.S. 460, 469-72, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). The Court instead looked at whether the statute or regulation purportedly creating the interest contained "language of an unmistakably mandatory character." Id. at 471, 103 S.Ct. 864.
 
 IV. The impact of Sandin
 
 19
 In June 1995, the Supreme Court rejected Hewitt's analysis. Sandin v. Conner, 515 U.S. 472, 480-84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). The Court acknowledged that states could create liberty interests that will be protected by the Due Process Clause but held that "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id. at 483-84, 115 S.Ct. 2293 (internal citations omitted). The Court explained, "[t]he time has come to return to the due process principles we believe were correctly established and applied in Wolff and Meachum." Id. at 483, 115 S.Ct. 2293. The Court also approved Morrissey's requirement that prisoners seeking due process protection show "they had suffered a grievous loss of liberty even after [being] sentenced to terms of imprisonment." Id. at 480, 92 S.Ct. 2593 (internal quotation marks omitted).
 
 
 20
 Thus, Sandin affirmed the validity of Morrissey and Meachum, the cases on which Tracy explicitly rests. Hewitt, which the Supreme Court disapproved, was decided five years after Tracy. Moreover, Sandin was an internal prison discipline case. The prisoner faced no loss of good time credits and was not taken out of the community and placed in a prison cell. Neither the facts nor the analysis of Sandin would lead a reasonable prison official to believe that Tracy, which applied to prisoners conditionally released to live in the community and which applied a Morrissey/Meachum analysis, was no longer valid precedent. The Tracy analysis is consistent with Morrissey, Wolff, and Meachum because the Tracy court found a grievous deprivation of liberty. Although the court also referred to the state's policies and practices, it used them to demonstrate entitlement and not, as was condemned in Sandin, to establish a liberty interest in the first place. See Sandin, 515 U.S. at 480-84, 115 S.Ct. 2293. As a result, there is no apparent reason why reasonable prison officials would believe Tracy had been undermined by Sandin.
 
 
 21
 Nevertheless, defendants argue that in 1996, a prison official could have had a reasonable doubt concerning Tracy's validity, based on (1) Sandin itself; (2) decisions from the First Circuit and from district courts in this circuit finding no liberty interest in temporary release after Sandin; and (3) dicta in Kim v. Hurston, 182 F.3d 113 (2d Cir.1999), indicating that Sandin placed Tracy in some doubt, id. at 117.
 
 
 22
 Defendants first argue that Sandin found statutes and regulations irrelevant to the existence of a liberty interest and imposed as the sole test whether "the alleged deprivation `imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" Defs.' Br. at 10 (quoting Sandin, 515 U.S. at 484, 115 S.Ct. 2293). Defendants also argue that Sandin created a more stringent test than grievous loss to establish that a prisoner had been deprived of a liberty interest. Because Tracy relied on a grievous deprivation and on prison policies, defendants suggest that Sandin undermined both aspects of Tracy.
 
 
 23
 Defendants' argument fails on both counts. First, Sandin did not dispense with statutory or regulatory language creating an entitlement. It simply held that the regulation at issue in that case did not create a liberty interest because the plaintiff had not shown an atypical or significant deprivation. The Court specifically recognized that states can create liberty interests protectable under the Due Process Clause by statute, regulation, or policy, when loss of those interests would constitute a grievous deprivation. Sandin, 515 U.S. at 483-84, 115 S.Ct. 2293. Thus, if an inmate has not suffered a deprivation so severe as to violate the Due Process Clause by its own force, the inmate must, in the intra-prison disciplinary context, show both an atypical and significant deprivation and a source for entitlement to protection of that interest in state law or policy. The requirement that the deprivation be "atypical and significant ... in relation to the ordinary incidents of prison life" is a refinement of Morrissey's grievous loss of liberty standard for the intra-prison disciplinary situation.[3]
 
 
 24
 Nor does Sandin create a test for identifying a liberty interest different from that set out in Morrissey, Wolff, and Meachum. After drawing the appropriate test from Wolff and Meachum, the Sandin court indicated that in the intra-prison disciplinary context, deprivation of a state-created liberty interest generally must impose an atypical and significant hardship "in relation to the ordinary incidents of prison life" in order to trigger due process protection. Sandin, 515 U.S. at 484, 115 S.Ct. 2293.
 
 
 25
 Sandin's reliance on Wolff, which found an important liberty interest in the retention of good time credits, and its earlier citation with approval of Morrissey, a parole revocation case, negate any suggestion that Sandin's particularized test should be applied outside the intra-prison disciplinary context. Because Anderson, like the petitioners in Morrissey and the plaintiffs in Tracy, lived outside the prison, a comparison to the ordinary conditions of prison life is inappropriate. Morrissey itself established that once the State has given an inmate the freedom to live outside an institution, it cannot take that right away without according the inmate procedural due process.
 
 
 26
 Defendants also argue, relying on Richardson v. Selsky, 5 F.3d 616 (2d Cir.1993), that because there was a split in the district courts concerning the impact of Sandin on Tracy, they are entitled to qualified immunity. The district courts did indeed differ on the impact of Sandin.[4] However, we do not agree that this split concerning Tracy's continuing vitality suggests that defendants are entitled to qualified immunity. Richardson's discussion of clearly established rights addressed a very different situation from the one presented in this case. In Richardson, we first found that the right in question — the right to an independent examination of an informant's credibility — had not been clearly established either by our court or by the Supreme Court. Richardson, 5 F.3d at 623. We then noted contradictory authority on this issue within the Southern District of New York and said:
 
 
 27
 "If the district judges in the Southern District of New York, who are charged with ascertaining and applying the law, could not determine the state of the law with reasonable certainty, it seems unwarranted to hold prison officials to a standard that was not even clear to the judges, especially since prescience on the part of prison officials is not required with respect to the future course of constitutional law." Id.
 
 
 28
 The situation here is very different. As a preliminary matter, none of the cases cited by defendants had been decided at the time DOCS revoked Anderson's temporary release status. More important, Richardson does not govern this case because we clearly established that there is a right to a hearing prior to final revocation of temporary release status before any of the district court cases was decided. See Tracy, 572 F.2d at 396-97. We will follow a precedent from this circuit unless a Supreme Court decision or an en banc holding of this court implicitly or explicitly overrules the prior decision, see, e.g., United States v. Ianniello, 808 F.2d 184, 190 & n. 11 (2d Cir.1986). Because Sandin did not overrule Tracy implicitly or explicitly, neither the defendants nor the district courts were free to ignore Tracy.
 
 
 29
 The First Circuit's conclusion that a prisoner on work release status is not entitled to a hearing prior to revocation of that status and reincarceration, Dominique v. Weld, 73 F.3d 1156, 1161 (1st Cir.1996), also is not relevant to the determination of whether Sandin placed Tracy in reasonable doubt in this circuit. See Young, 160 F.3d at 903 (holding that a right is clearly established if, among other things, it is recognized by the Supreme Court or this circuit). Moreover, the Dominique court ignored Sandin's explicit approval of the holdings in Morrissey, Meachum, and Wolff.
 
 
 30
 Nor does Kim's dictum indicate that Sandin undermined Tracy. We said in Kim that "[t]o the extent that [Tracy] rested on" the narrow discretion accorded to the State in granting admission to a work release program, "it was placed in some doubt by the Supreme Court's decision in Sandin." Kim, 182 F.3d at 117. Because Young v. Harper, 520 U.S. 143, 152-53, 117 S.Ct. 1148, 137 L.Ed.2d 270 (1997), which found that a prisoner had a liberty interest in continued participation in a pre-parole program, had been issued at the time we decided Kim, we did not explore whether Tracy used state law and policy in an impermissible way. Kim, 182 F.3d at 118. In addition, we did not need to decide any qualified immunity issues because Kim's temporary release status was revoked before Sandin was decided. Id. at 120. In fact, however, Tracy relied on state law only to the extent permissible and necessary under Sandin, Morrissey, and Wolff. That is, the Tracy court first found that expulsion from the work release program was a grievous loss. Tracy, 440 F.Supp. at 933-34. Only then did the court turn to state law to determine whether it offered protection to the substantial interest plaintiffs had in continuing in their work release status. Id. at 934-35.
 
 
 31
 Finally, the lack of relevance Sandin has to work release and similar programs became even more apparent — albeit after the actions under review on this appeal — when the Supreme Court decided Young. Relying almost exclusively on Morrissey and without employing a Sandin analysis, the Young court held that plaintiff had a liberty interest in Oklahoma's pre-parole program, which is quite similar to New York's work release program. Young, 520 U.S. at 148-53, 117 S.Ct. 1148; see also Kim, 182 F.3d at 118 (describing Kim's work release program as "virtually indistinguishable from either traditional parole or the [pre-parole] program considered in Young"). Although Young had not been decided when New York revoked Anderson's work release status and thus does not enter into the qualified immunity analysis, it graphically demonstrates why defendants acted unreasonably in comparing the apples of revoking a work release program with the oranges of an intraprison disciplinary transfer.
 
 CONCLUSION
 
 32
 For the reasons we have discussed, we affirm the district court's dismissal of claims against Commissioner Goord but vacate the dismissal of the claims against the remaining defendants.
 
 
 
 Notes:
 
 
 [1]
 Neither party argues that any procedural guarantees Anderson enjoyed at this hearing justify the lack of due process accorded Anderson with respect to the revocation of his temporary release status. Therefore, we do not address this question and intimate no view concerning its correct resolution
 
 
 [2]
 The parties subsequently stipulated "that the Court's decision in this proceeding will be deemed to be withdrawn and will not be considered legal precedent for any similar proceeding of this nature by other inmates or individuals in similar circumstances." We make no finding on the effect, if any, of this stipulation
 
 
 [3]
 Even if it were possible to readSandin as eliminating liberty interests rooted in statute or regulation, it would not have been reasonable to read it in that fashion at the time defendants revoked Anderson's temporary release status. Before that date, June 5, 1996, we decided Frazier v. Coughlin in which we said, "nothing in Sandin suggests that a protected liberty interest arises in the absence of a particular state regulation or statute that (under Hewitt) would create one." Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir. Apr.10, 1996) (per curiam).
 
 
 [4]
 Compare Duffy v. Selsky, 1996 WL 407225, *12 (S.D.N.Y. July 18, 1996) (rejecting liberty interest); Dudley v. Coombe, 1997 WL 423074, *3 (S.D.N.Y. July 28, 1997) (same); Tillotson v. Callender, 1998 WL 136570, *5 (E.D.N.Y. Mar.20, 1998) (stating that liberty interest is unclear) with Roucchio v. Coughlin, 923 F.Supp. 360, 376-77 (E.D.N.Y.) (upholding liberty interest); Greaves v. New York, 951 F.Supp. 33, 35 (S.D.N.Y.1996) (same); Quartararo v. Catterson, 917 F.Supp. 919, 940 (E.D.N.Y.1996) (same); Hollingsworth v. Robinson, 901 F.Supp. 565, 570 (E.D.N.Y.1995) (assuming same). See also Pena v. Recore, 1997 WL 581058, *1, 6-8 (E.D.N.Y. Sept.16, 1997) (collecting cases showing split); Garcia v. Payne, 1998 WL 50207, *2 (S.D.N.Y. Feb.9, 1998) (same).