07-0833-cv
Consub Delaware, LLC v. Schahin Engenharia Limitada

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2007

Docket No. 07-0833-cv

(Argued: May 15, 2008                    Decided: September 23, 2008)

_____

CONSUB DELAWARE LLC,

Plaintiff-Appellee,

v.

SCHAHIN ENGENHARIA LIMITADA,

Defendant-Appellant,

STANDARD CHARTERED BANK,

Garnishee.

_____

Before:  CARDAMONE, MINER, and POOLER, Circuit Judges.

Appeal from a February 13, 2007 order entered in the United States District Court for the Southern District of New York (Scheindlin, J.) denying defendant-appellant's motion to vacate a maritime writ of attachment against it and in favor of plaintiff-appellee, the District Court having found that funds that are the subject of an electronic funds transfer are property subject to a maritime attachment while they are in the hands of an intermediary bank; and that clauses in the agreements between the parties providing for exclusive jurisdiction in the courts of England did not preclude plaintiff-appellee from seeking a maritime writ of attachment in the District Court or divest the District Court of jurisdiction to issue such a writ.

The judgment of the District Court is affirmed.

CHRISTOPHER CARLSON (Marla DiResta, on the brief), Clyde & Co. US LLP, New York, NY, for Defendant-Appellant.

NEIL E. MCDONELL (Stephen M. Raab, on the brief), Dorsey & Whitney LLP, New York, NY, for Plaintiff-Appellee.

MINER, Circuit Judge:

Defendant-appellant Schahin Engenharia Limitada ("Schahin") appeals from a February 13, 2007 order entered in the United States District Court for the Southern District of New York (Scheindlin, J.) denying its motion to vacate a maritime writ of attachment held by plaintiff-appellee Consub Delaware LLC ("Consub"). The District Court held, pursuant to Winter Storm Shipping, Ltd. v. TPI, 310 F.3d 263 (2d Cir. 2002), that funds that are the subject of an electronic funds transfer ("EFT") are property subject to a maritime attachment while they are in the hands of an intermediary bank. The District Court further found that clauses in agreements between the parties providing for exclusive jurisdiction over disputes arising from those agreements in the courts of England did not preclude Consub from seeking a maritime writ of attachment in the District Court or divest the District Court of jurisdiction to issue such a writ. For the reasons that follow, the judgment of the District Court is affirmed.

**BACKGROUND**

I.    The Agreements

On November 8, 2001, Consub and Schahin (along with other parties unrelated to this proceeding) entered into a novation agreement (the "Novation Agreement") whereby Consub agreed to perform for Schahin certain maritime obligations with respect to submarine fiber-optics. The Novation Agreement and its accompanying obligations were entered into pursuant to an existing agreement titled "ACMA 2001 Submarine Telecommunications Cable Maintenance and Related Services Agreement," dated June 30, 2000 (the "ACMA Agreement" and

collectively, with the Novation Agreement, the "Agreements"), which was executed between Schahin and other parties unrelated to this action. The Novation Agreement provided that Consub was to assume the obligations of one of the original parties to the ACMA Agreement and thereby to become bound by the ACMA Agreement. Pursuant to these Agreements, Consub provided and operated a vessel equipped to carry out maintenance and report operations on submarine fiber-optic cables located on the high seas.

The ACMA Agreement and the Novation Agreement each contained a forum selection clause. Article 22.4 of the ACMA Agreement provided that "[t]he Agreement shall be considered as an Agreement made in England and subject to English law under the exclusive jurisdiction of the courts of England and Wales." Article 3.2 of the Novation Agreement provided that "[e]ach of the parties hereby submit [sic] to the exclusive jurisdiction of the English Courts in relation to any dispute or claim arising out of or in connection with this Novation Agreement."

Each Agreement also contained an arbitration clause. Article 22.5 of the ACMA Agreement provided, in relevant part, that "[a]s an alternative to litigation, and if the Parties so agree, any differences of opinion which may arise in respect of the interpretation and execution of the Agreement and any dispute which may subsist may be settled in accordance with the Rules of Arbitration and Conciliation of the International Chamber of Commerce." Article 3.3 of the Novation Agreement provided, similarly, in relevant part, that "[a]s an alternative to the English Courts, and if the parties so agree, any dispute or claim arising out of or in connection with this Novation Agreement may be settled in arbitration in accordance with Clauses 22.5 and 22.6 of the [ACMA] Agreement."

3

The ACMA Agreement further provided that "[a]ny decision or award by the arbitration tribunal shall be final and binding upon the Parties . . . [and] may be enforced against the parties to the arbitration proceeding or their assets wherever they may be found.  Judgment upon the award may be entered in any court having jurisdiction thereof."

II.     Proceedings in London

Consub commenced proceedings on November 26, 2003 in the Royal Courts of Justice in London (the "English Proceedings") in accordance with the Agreements' forum selection clauses, in order to collect payments it alleges are owed for the services it performed for Schahin.  Since the initiation of the English Proceedings, Schahin has filed various applications in Brazilian courts claiming that it was not properly served with process in Brazil, where it is located.  Consub avers that Schahin's aim is merely to delay the proceedings in London.  Schahin's applications currently remain pending in the courts in Brazil.

III.    Proceedings in the Southern District of New York

On November 13, 2006, Consub filed a complaint in the United States District Court for the Southern District of New York seeking a maritime attachment and garnishment pursuant to Supplemental Rule B ("Rule B") of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure (the "Admiralty Rules") to secure its claim against Schahin in the amount of $5,986,117.65, including principal, interest, and fees.  On November 14, 2006, the District Court granted Consub's request and issued an ex parte Order for Process of Maritime Attachment ("Attachment Order"), which Consub thereafter served on the garnishees named therein, including Standard Chartered Bank.  The Attachment Order authorized the attachment of "all tangible or intangible property belonging to, claimed by or being held for

4

Schahin . . . in an amount up to and including $5,986,117.65."

On or about December 1, 2006, in an unrelated transaction, Schahin instructed its bank in Brazil, Banco Schahin S.A. ("Banco Schahin"), to transfer funds in the amount of $4,281,767.96 from its account at Banco Schahin to a third-party's U.S. dollar-denominated account at Clariden Bank in Zurich, Switzerland. Because this funds transfer involved the conversion of Brazilian reais into United States dollars, the transfer was routed through two intermediary banks in the United States. On December 4, 2006, after receiving Schahin's transfer order, Banco Schahin in turn issued its own transfer order to intermediary bank Standard Chartered Bank in New York. Banco Schahin's transfer order instructed Standard Chartered Bank, one of the garnishees named in the Attachment Order, to transfer the funds, with a value date of December 4, 2006, to the beneficiary bank, Clariden Bank in Switzerland, via another New York intermediary bank, Bank of New York.

On December 6, 2006, Standard Chartered Bank advised Banco Schahin that the electronic funds transfer of $4,281,767.96 being routed through its bank in accordance with Banco Schahin's payment order had been frozen in compliance with the Attachment Order.

Following the attachment of Schahin's funds at Standard Chartered Bank, Consub asked Schahin to post a bank guarantee in lieu of the attachment, but Schahin declined Consub's invitation. Instead, on December 15, 2006, Schahin served Consub with an order to show cause in support of a motion to vacate the attachment, arguing, in part, that funds in transit via an EFT are not "property" within the meaning of Rule B of the Admiralty Rules and that Consub therefore had not properly attached the funds. Schahin also claimed that the forum selection clauses in the Agreements prohibited Consub from seeking a Rule B maritime attachment

5

through courts in New York. Schahin did not dispute that the District Court had personal jurisdiction over it.

On February 13, 2007, the District Court denied Schahin's motion to vacate the Attachment Order, following our decision in Winter Storm Shipping, Ltd. v. TPI, 310 F.3d 263 (2d Cir. 2002), which held that funds in transit via EFTs are subject to attachment under Rule B while in the hands of an intermediary bank. See Consub Del. LLC v. Schahin Egenharia Limitada, 476 F. Supp. 2d 305 (S.D.N.Y. 2007). The District Court stated that Winter Storm "remains good law and is binding on this Court." Id. at 311. The District Court also rejected Schahin's forum selection argument, finding that "the Agreements' exclusive jurisdiction clauses do not, and were not intended to, preclude Rule B attachment in this Court." Id. at 312.

Schahin moved in December 2006 for permission to file an interlocutory appeal on the EFT issue. In its February 13, 2007 order denying Schahin's motion to vacate the Attachment Order, the District Court certified the February 13, 2007 order for interlocutory appeal under 28 U.S.C. § 1292(b). Id. at 313 ("The sole ground on which Schahin seeks interlocutory appeal is this Court's decision to follow Winter Storm and hold that EFTs are property and thus subject to Rule B attachment. I find that this issue warrants immediate review on appeal."). After the February 13, 2007 order was issued, Schahin moved for certification of the forum selection issue for interlocutory appeal. The District Court denied that motion. This Court granted Schahin permission to appeal the order on the basis of the EFT issue on April 20, 2007. The attached funds of $4,281,767.96 remain frozen at Standard Chartered Bank pending the outcome of this appeal.

**DISCUSSION**

6

I.    Jurisdiction

We have appellate jurisdiction to entertain Schahin's claims related to the questions (1) whether Rule B permits attachment of funds in EFTs and (2) whether the forum selection clauses in the Agreements preclude a Rule B attachment.  The District Court's denial of Schahin's motion to certify the question related to the forum selection clauses is of no consequence because the District Court's certification of the EFT issue — in its February 13, 2007 order denying Schahin's motion to vacate the Attachment Order — had the effect of certifying the entire February 13, 2007 order, not just the question whether funds in EFTs are subject to maritime attachments while in the hands of intermediary banks.  See United States v. Stanley, 483 U.S. 669, 676–77 (1987) (explaining that 28 U.S.C. § 1292(b) "brings the 'order,' not the question, before the [appellate] court"); City of New York v. Beretta U.S.A. Corp., 524 F.3d 384, 391–92 (2d Cir. 2008) ("When a district court certifies, pursuant to 28 U.S.C. § 1292(b), a question of controlling law, the entire order is certified and we may assume jurisdiction over the entire order, not merely over the question as framed by the district court.").

II.    Standard of Review

This Court reviews a district court's decision on a motion to vacate a maritime attachment order for abuse of discretion.  Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd., 460 F.3d 434, 439 (2d Cir. 2006).  On appeal from a district court's determination as to the applicability of a forum selection clause, we review factual findings for clear error and legal conclusions de novo.  See Asoma Corp. v. SK Shipping Co., Ltd.,  467 F.3d 817, 822 (2d Cir. 2006).

III.    Whether an EFT in the Hands of an Intermediary Bank is the Property of the Originator

7

and is Subject to a Rule B Maritime Attachment

Schahin urges us to apply New York law — specifically, Article 4-A of New York's Uniform Commercial Code — to answer the question whether funds that are the subject of an EFT remain the property of the originator while they are held by an intermediary bank. Schahin concedes, as it must, that success on this argument is conditioned upon an overruling of the decision in Winter Storm, which held that funds in the hands of an intermediary bank pursuant to an EFT are the property of the originator and are therefore subject to a Rule B maritime attachment.

Schahin relies on language in a footnote in Aqua Stoli that expressed doubt about the holding in Winter Storm and its reliance on precedent that involved forfeiture law. Aqua Stoli noted that:

> The correctness of our decision in Winter Storm seems open to question, especially its reliance on [United States v.] Daccarett, [6 F.3d 37 (2d Cir. 1993)], to hold that EFTs are property of the beneficiary or sender of an EFT. Because Daccarett was a forfeiture case, its holding that EFTs are attachable assets does not answer the more salient question of whose assets they are while in transit. In the absence of a federal rule, we would normally look to state law, which in this case would be the New York codification of the Uniform Commercial Code, N.Y. U.C.C. Law § 4-A-502 to 504. Under state law, the EFT could not be attached because EFTs are property of neither the sender nor the beneficiary while present in an intermediary bank. Id. §§ 4-A-502 cmt. 4, 4-A-504 cmt. 1.

Aqua Stoli, 460 F.3d at 446 n.6 (emphasis in original). Our holding today ought to jettison any speculation that this note in Aqua Stoli foretold the demise of Winter Storm. Aqua Stoli concerned Admiralty Rule E(4)(f), which governs motions to vacate orders of attachment. Although the attachment at issue in Aqua Stoli was of EFT funds, the question in that case was not whether those funds could permissibly be attached but what the correct standard was for

8

vacatur of an attachment order pursuant to Admiralty Rule E(4)(f). See id. at 447 (discussing the limited circumstances under which districts courts may exercise discretion to vacate Rule B attachment orders based on equitable grounds). Moreover, footnote six, on its face, acknowledged that federal law — i.e., Admiralty Rule B — governs the question of who owns the funds in an EFT as they pass through an intermediary bank. See id. at 446 n.6 ("In the absence of a federal rule [i.e. Rule B], we would normally look to state law" to answer the question of "whose assets [the funds] are while in transit."). Finally, Aqua Stoli itself affirmed that the rule set forth in Winter Storm is the law of this jurisdiction. See id. at 436 ("Under the law of this Circuit, EFTs to[1] or from a party are attachable by a court as they pass through banks located in that court's jurisdiction." (citing Winter Storm, 310 F.3d at 263)).

Even if there existed some question as to the viability of Winter Storm, it is well established in this Circuit that "one panel of this Court cannot overrule a prior decision of another panel, unless there has been an intervening Supreme Court decision that casts doubt on [this Court's] controlling precedent," Veltri v. Bldg. Serv. 32B-J Pension Fund, 393 F.3d 318, 327 (2d Cir. 2004) (internal quotation marks omitted), or unless an en banc panel of this Court overrules the prior decision, Anderson v. Recore, 317 F.3d 194, 201 (2d Cir. 2003). There has been no intervening Supreme Court case, and no decision by an en banc panel overruling Winter Storm.[2] Moreover, there is no justification for departing from the principle of stare decisis here

---

[1] We do not reach today the question of whether funds involved in an EFT en route to a defendant are subject to a Rule B attachment.

[2] Schahin petitioned this Court for a "hearing en banc." Schahin claimed, based substantially on the reasons it advances on appeal, that this case involves issues of exceptional importance because of the potential for the (1) serious disruption of the functioning of the New York banking industry; (2) creation of new law directly at odds with existing federal precedent

9

where Schahin has not shown that <u>Winter Storm</u> is unworkable, and where admiralty jurisdiction is the subject of congressional legislation and Congress remains free to alter the <u>Winter Storm</u> rule.

In any event, <u>Winter Storm</u> was correctly decided. In <u>Winter Storm</u>, this Court held that "EFT funds in the hands of an intermediary bank may be attached pursuant to Admiralty Rule B(1)(a)." 310 F.3d at 278. Rule B(1)(a) provides:

> If a defendant is not found within the district when a verified complaint praying for attachment and the affidavit required by Rule B(1)(b) are filed, a verified complaint may contain a prayer for process to attach the defendant's tangible or intangible personal property — up to the amount sued for — in the hands of garnishees named in the process.

FED. R. CIV. P. SUPP. R. B(1)(a). <u>Winter Storm</u> relied on "the broad, inclusive language of Admiralty Rule B(1)(a)" as well as the EFT analysis in <u>Daccarett</u>, 6 F.3d 37. In <u>Daccarett</u>, the United States government attached the proceeds of illegal drug sales while the proceeds were being routed through intermediary banks in New York. The attachments were made pursuant to 21 U.S.C. § 881(a)(6), which provides for the forfeiture to the government of "[a]ll moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance [as well as] all proceeds traceable to such an exchange." 21 U.S.C. § 881(a)(6). The claimants in <u>Daccarett</u> argued that the EFTs were "merely electronic communications" and therefore were not seizable property under the forfeiture statute. 6 F.3d at 54. <u>Daccarett</u> rejected that argument, holding that "an EFT while it takes the form of a bank credit at an intermediary bank is clearly a seizable <u>res</u> under the forfeiture

and New York State banking law; and (3) interference with the goal of uniformity in maritime attachments sought to be achieved in admiralty law. Schahin's petition was denied by this Court on November 8, 2007.

10

statutes." 6 F.3d at 55.

According to Schahin, Daccarett should be restricted to the "narrow" holding that the proceeds of an illegal drug sale in the form of an EFT at an intermediary bank constitute a res that can be seized under the forfeiture statute. Schahin argues that the property ownership of the funds was not at issue in Daccarett because the proceeds were forfeited to the government at the moment of the drug sale. See Manufacturas Int'l, Ltda. v. Mfrs. Hanover Trust Co., 792 F. Supp. 180, 188 (E.D.N.Y. 1992) (Under the forfeiture statutes, the proceeds of the illegal drug sales are "considered forfeited [to the government] at the moment the illegal act is committed."). Schahin's argument, however, is belied by Daccarett itself, which referred to United States v. 92 Buena Vista Avenue, 507 U.S. 111 (1993), for the proposition that the Supreme Court has clarified "the government cannot contend that it owns the defendant properties until a judgment of forfeiture is entered" in favor of the government. Daccarett, 6 F.3d at 53–54.

In Winter Storm, this Court anticipated Schahin's argument. This Court found that there was no principled distinction between the seizure pursuant to the forfeiture laws in Daccarett and the admiralty attachment at issue in Winter Storm:

> It is of no moment that Daccarett was a drug case and this is an admiralty case, or that the civil forfeiture statute and the Admiralty Rules differ in their descriptions of the circumstances justifying process against property, or that in Daccarett the government used Admiralty Rule C to arrest the funds while Winter Storm used Rule B to attach them. These are distinctions without a difference because they do not bear upon the decisive question presented, namely, whether EFT funds in the hands of an intermediary bank are subject to interdiction by legal process. Daccarett's holding that such funds are subject to Admiralty Rule C arrest furnishes authority for the conclusion that they are equally subject to Admiralty Rule B attachment.

11

Winter Storm, 310 F.3d. at 278.[3]  Even more to the point, Winter Storm reasoned, independent of Daccarett, that "[t]here is no question that federal admiralty law regards a defendant's bank account as property subject to maritime attachment under Rule B."  310 F.3d at 276.  This court was therefore "[un]able to discern in admiralty law or elsewhere a basis for regarding [the defendant's funds] in [the intermediary bank's] hands prior to their electronic transfer to [the plaintiff's bank account] as anything other than funds held by [the intermediary bank] for the account of [the defendant]."  Id.

Schahin urges us to apply New York's Uniform Commercial Code, N.Y.U.C.C. LAW §§ 4-A-502–04 to the questions of (1) whether funds in an EFT may be seized at an intermediary bank and (2) who owns the funds as they pass through the intermediary bank.  According to Schahin, property rights have traditionally been a domain of state law; New York's status as a financial center justifies the application of New York law; and the application of Article 4-A will promote admiralty law's goal of uniformity.  Section 4-A-503 provides:

> For proper cause and in compliance with applicable law, a court may restrain (i) a person from issuing a payment order to initiate a funds transfer, (ii) an originator's bank from

---

[3] Winter Storm also discussed the unsuccessful argument made by the claimants in Daccarett that the EFT transaction was merely an electronic communication:

> While claimants would have us believe that modern technology moved the funds from the originating bank through the intermediary bank to their ultimate destination without stopping, that was not the case.  With each EFT at least two separate transactions occurred: first, funds moved from the originating bank to the intermediary bank; then the intermediary bank was to transfer the funds to the destination bank . . . .  While the two transactions can occur almost instantaneously, sometimes they are separated by several days.  Each of the amounts at issue was seized at the intermediary bank after the first transaction had concluded and before the second had begun.

310 F.3d. at 277 (quoting Daccarett, 6 F.3d at 54).

12

executing the payment order of the originator, or (iii) the beneficiary's bank from releasing funds to the beneficiary or the beneficiary from withdrawing the funds. A court may not otherwise restrain a person from issuing a payment order, paying or receiving payment of a payment order, or otherwise acting with respect to a funds transfer.

N.Y. U.C.C. LAW § 4-A-503. Section 4-A-502 provides, in pertinent part: "Creditor process with respect to a payment by the originator to the beneficiary pursuant to a funds transfer may be served only on the beneficiary's bank . . . . Any other bank served with the creditor process is not obliged to act with respect to the process." N.Y. U.C.C. LAW 4-A-502(4). Schahin further relies on Aqua Stoli for the proposition that under New York's U.C.C., funds that are the subject of an EFT at an intermediary bank cannot be attached under Rule B "because [under New York State law] EFTs are property of neither the sender nor the beneficiary while present in an intermediary bank." Aqua Stoli, 460 F3d. at 446 n.6 (citing N.Y. U.C.C. §§ 4-A-502 cmt. 4 ("[A] creditor of the originator cannot reach any other funds because no property of the originator is being transferred."), 4-A-504 cmt. 1). According to Schahin, the foregoing establishes that EFTs are the property of the intermediary bank. Section 4-A-502, however, merely provides that intermediary banks need not act with respect to process served upon them — it does not vest the property interest in those funds in the intermediary bank.[4] Footnote 6 of Aqua Stoli, therefore,

---

[4] Consub argues that under New York law, Schahin actually retained control over the funds while they were in transit. According to Consub, the series of debits and credits involved in the EFT was governed by Schahin's instructions, see N.Y. U.C.C. LAW § 4-A-302(1)(a), and Schahin retained certain rights and risks in connection with the transfer, including a general "money back guarantee" if the transfer was not completed and potentially a right to interest if the payment was delayed, see N.Y. U.C.C. LAW §§ 4-A-305, 402(3)-(4) & cmt. 2. Schahin also retained a risk of loss with respect to the funds to the extent it was responsible for the failure of the EFT to be properly completed. See N.Y. U.C.C. LAW § 4-A-402(5) & cmt. 2. Because New York law does not apply here to the issue of the permissibility of the attachment of the EFT funds, we do not reach questions of Schahin's property interest in the funds under New York law.

provides no support for Schahin's argument that intermediary banks own the EFT funds in their possession.

In any event, the outcome of these questions under New York law is not determinative here where, as Schahin does not dispute, admiralty jurisdiction exists. Schahin relies on Banque Worms v. BankAmerica Int'l, 77 N.Y.2d 362, 372 (N.Y. 1991), which explained:

> Both the . . . drafters of Article 4A and the New York Legislature sought to achieve a number of important policy goals through enactment of [Article 4-A]. National uniformity in the treatment of electronic funds transfers is an important goal, as are speed, efficiency, certainty (i.e., to enable participants in fund transfers to have better understanding of their rights and liabilities), and finality.

77 N.Y.2d at 372. Banque Worms, however, did not involve admiralty jurisdiction, and Schahin does not dispute that the Agreements involved here are maritime contracts. "The use of the process of attachment in civil causes of maritime jurisdiction by courts of admiralty . . . has prevailed during a period extending as far back as the authentic history of those tribunals can be traced." Atkins v. Disintegrating Co., 85 U.S. (18 Wall.) 272, 303 (1874). We have previously elaborated on the policy reasons supporting the application of Rule B, rather than state law, to maritime attachments:

> [G]iven the importance of maritime attachment, . . . leaving the functional usefulness of Rule B attachments to the vagaries of the laws of fifty states would create a measure of anarchy in a federal scheme designed to insure that maritime actors may be sued where their property is found. Such anarchy would be inconsistent with an ancient purpose of admiralty law in providing convenient fora for those who want to enforce rights under maritime law against hard-to-catch defendants. It would also be detrimental to international commerce.

Aurora Maritime Co. v. Abdullah Mohamed Fahem & Co., 85 F.3d 44, 48–49 (2d Cir. 1996). These policies lend support to Consub's argument that EFT funds should be particularly susceptible to Rule B attachments, given the ease of mobility of both funds and defendants. See

14

id. at 49 ("[I]n light of the mobility of maritime defendants and their capital, permitting [state law] to trump Rule B attachments would undermine a rule upon which maritime actors rely . . . ." (internal quotation marks omitted)). New York law has no effect on the applicability of Rule B to funds involved in EFTs while they are in the hands of intermediary banks: "Because that rule is derived from federal law, there is no occasion to look for guidance in state law." Winter Storm, 310 F.3d at 278. Accordingly, we affirm the District Court's application of Winter Storm to this case and its conclusion that the funds held by Standard Chartered Bank were seizable under the Attachment Order.

IV.    Whether the Forum Selection Clauses Preclude a Rule B Attachment

Schahin's second argument in support of vacatur of the Attachment Order is based on the forum selection clauses in the Agreements. The forum selection clause in the Novation Agreement provides: "Each of the parties hereby submit [sic] to the exclusive jurisdiction of the English Courts in relation to any dispute or claim arising out of or in connection with this Novation Agreement." The forum selection clause in the ACMA Agreement states that "[t]he Agreement shall be considered as an Agreement made in England and subject to English law under the exclusive jurisdiction of the courts of England and Wales."[5] Schahin's theory is that Rule B maritime attachments can survive forum selection clauses only where those clauses are expressly restricted to disputes on the merits. Schahin claims that the forum selection clauses express the intent of the parties that all judicial proceedings, including all prejudgment attachment proceedings, be conducted exclusively in the English Courts. The District Court

---

[5] This clause in the ACMA Agreement might also be characterized as a choice-of-law clause, but the applicability of English substantive law is not at issue here.

disagreed, concluding that "the language of the Novation Agreement's forum selection clause is unambiguous and . . . the Agreements' exclusive jurisdiction clauses do not, and were not intended to, preclude Rule B attachment in this Court." Consub Del. LLC, 476 F. Supp. 2d at 312.

"The primary objective of a court in interpreting a contract is to give effect to the intent of the parties as revealed by the language of their agreement." Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc., 232 F.3d 153, 157 (2d Cir. 2000) (citing Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan, 7 F.3d 1091, 1094 (2d Cir.1993)).

According to Schahin, the "in relation" and "in connection with" clauses demonstrate that the forum selection clause applies to any dispute related to the Novation Agreement, and not just to disputes concerning the merits. The District Court concluded that a Rule B attachment "in no way interferes with the exclusive jurisdiction of the English Courts to decide any matter 'in relation to any dispute or claim' arising out of the Agreements." Consub Del. LLC, 476 F. Supp. 2d at 312. The District Court relied on the Ninth Circuit's decision in Polar Shipping Ltd. v. Oriental Shipping Corp., 680 F.2d 627, 631 (9th Cir. 1982), which reasoned that a clause providing that "[a]ny dispute arising under the charter shall be decided by the English Courts" did not demonstrate an "inten[t] to limit proceedings to obtain prejudgment security" to the English Courts because a Rule B "attachment does not fit neatly within the word 'dispute.'" Id. at 632 (first alteration in original). The District Court also noted that other courts within this Circuit have followed the reasoning in Polar Shipping. See Consub Del. LLC, 476 F. Supp. 2d at 311 n.34 (citing, e.g., Sea Transport Contractors, Ltd. v. Indus. Chemiques du Senegal, 411 F.

16

Supp. 2d 386 (S.D.N.Y. 2006); Staronset Shipping Ltd. v. N. Star Navigation Inc., 659 F. Supp. 189 (S.D.N.Y. 1987)).

Schahin claims that the District Court's analysis "ignores the threshold issue" of what exactly the parties agreed to. We disagree. In addition to the plain language of the forum selection clauses, the District Court looked at the arbitration clause in the ACMA Agreement, which stated that an arbitration award "may be enforced against the parties to the arbitration proceeding or their assets wherever they may be found." From that language, the court reasoned that the parties "anticipate[d] the involvement of courts outside of England for the purpose of satisfying an eventual judgment." Consub Del. LLC, 476 F. Supp. 2d at 313. Schahin emphasizes the fact that the arbitration clause refers to other courts beside English courts whereas the litigation forum selection clause does not. We agree with Consub that Schahin offers no reason why the parties would have agreed to make collateral enforcement procedures available worldwide for arbitration but not for litigation.

Consub also argues that under English law, exclusive jurisdiction clauses are construed to exclude applications for ancillary relief made in other jurisdictions. The District Court considered this argument, citing to Consub's expert on English law and noting that under English law, clauses providing for exclusive jurisdiction in the English courts do not limit pre-judgment attachment proceedings to the chosen forum. Consub Del. LLC, 476 F. Supp. 2d at 311 n.34 ("English law is consistent with the approach followed in Polar Shipping." (citing Declaration of Timothy Jean-Paul Howe, Consub's preferred expert on English law, as to English law on Exclusive Jurisdiction Clauses)).

We conclude that the Agreement is subject to the jurisdiction of the English courts and

17

that an attachment "does not fit neatly" into the word "Agreement," see Polar Shipping, 680 F.2d at 632. Schahin has not demonstrated how the forum selection clauses in the Novation Agreement and the ACMA Agreement are different from other forum selection clauses that have been held not to divest courts outside of the selected forum of admiralty jurisdiction.

## CONCLUSION

For the foregoing reasons, the judgment of the District Court is AFFIRMED.