08-3477-cv(L), 08-3758-cv(XAP)
The Shipping Corporation of India Ltd v. Jaldhi Overseas Pte Ltd.

### UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT

August Term 2008

(Argued: May 5, 2009)                                        Decided: October 16, 2009)

Docket Nos. 08-3477-cv(L), 08-3758-cv(XAP)

THE SHIPPING CORPORATION OF INDIA LTD.,

> *Plaintiff-Counter-Defendant-Appellant-Cross-Appellee*,

> v.

JALDHI OVERSEAS PTE LTD.,

> *Defendant-Counter-Claimant-Appellee-Cross-Appellant.*

Before: FEINBERG, WINTER, and CABRANES *Circuit Judges.*

_____

Plaintiff The Shipping Corporation of India, Ltd. ("SCI") appeals from a June 27, 2008 order

of the United States District Court for the Southern District of New York (Jed S. Rakoff, *Judge*)

insofar as it vacated portions of an order of maritime attachment and garnishment entered by the

District Court on May 7, 2008, pursuant to Rule B of the Supplemental Rules for Admiralty or

Maritime Claims and Asset Forfeiture Actions of the Federal Rules of Civil Procedure ("Rule B").

Defendant Jaldhi Overseas Pte Ltd. cross-appeals from the same June 27, 2008 order insofar as it

denied defendant's motion for counter-security for various counterclaims pending in arbitration on

the grounds that SCI, as an alleged instrumentality of the government of India, was entitled to

immunity from pre-judgment attachment under the Foreign Sovereign Immunity Act, 28 U.S.C.

§§ 1602-1611.  We hold that electronic fund transfers ("EFTs") being processed by an intermediary

bank are not property subject to attachment under Rule B, and, with the consent of all of the judges

of the Court in active service, we overrule *Winter Storm Shipping, Ltd. v. TPI*, 310 F.3d 263, 278 (2d Cir. 2002), to the extent that it is inconsistent with this opinion. Accordingly, we affirm the order of the District Court vacating those portions of its maritime attachment affecting EFTs of which defendant was the beneficiary. We remand the cause to the District Court for further proceedings consistent with this opinion with respect to the remaining portions of the attachment order affecting EFTs of which defendant was the originator. In addition, we decline to consider defendant's cross-appeal regarding a claim for counter-security as it is likely moot.

Affirmed in part, vacated in part, and remanded.

JEREMY J. O. HARWOOD, Blank Rome LLP, New York, NY, *for plaintiff-counter-defendant-appellant-cross-appellee The Shipping Corporation of India Ltd.*

RAHUL WANCHOO, Glen Rock, NJ, *for defendant-counter-claimant-appellee-cross-appellant Jaldhi Overseas Pte Ltd.*

Bruce E. Clark, (H. Rodgin Cohen, Michael M. Wiseman, Laurent S. Wiesel, Scott A. Rader, *of counsel*), Sullivan & Cromwell LLP, New York, NY, *for Amicus Curiae The Clearing House Association L.L.C.*

JOSÉ A. CABRANES, *Circuit Judge*:

This case is based on a dispute between a company incorporated in India and a company incorporated in Singapore over an accident that occurred in India while one company was shipping products to China; the dispute was to be arbitrated in England. Because the parties' *banks* had

2

accounts in New York banks, electronic fund transfers ("EFTs")[1] between one party involved in the

dispute and third parties passed through New York electronically for an instant. Under *Winter Storm*

---

[1] We explained the operation of EFTs in *United States v. Daccarett*, 6 F.3d 37, 43-44 (2d Cir. 1993) and paraphrase that explanation here:

An EFT is nothing other than an instruction to transfer funds from one account to another. When the originator and the beneficiary each have accounts in the same bank that bank simply debits the originator's account and credits the beneficiary's account. When the originator and beneficiary have accounts in different banks, the method for transferring funds depends on whether the banks are members of the same wire transfer consortium. If the banks are in the same consortium, the originator's bank debits the originator's account and sends instructions directly to the beneficiary's bank upon which the beneficiary's bank credits the beneficiary's account. If the banks are not in the same consortium—as is often true in international transactions—then the banks must use an intermediary bank. To use an intermediary bank to complete the transfer, the banks must each have an account at the intermediary bank (or at different banks in the same consortium). After the originator directs its bank to commence an EFT, the originator's bank would instruct the intermediary to begin the transfer of funds. The intermediary bank would then debit the account of the bank where the originator has an account and credit the account of the bank where the beneficiary has an account. The originator's bank and the beneficiary's bank would then adjust the accounts of their respective clients. *See* Amicus Br. 9-11.

To more concretely illustrate the circumstances of the instant case, consider the following example: ABC Shipping wants to transfer $100 to XYZ Overseas. ABC has an account at India National Bank, and XYZ has an account at Bank of Thailand. India National Bank and Bank of Thailand do not belong to the same consortium, but each has an account at New York Bank. To begin the transfer, ABC instructs India National Bank to transfer $100 to XYZ's account at Bank of Thailand. India National Bank then debits ABC's account and forwards the instruction to New York Bank. New York Bank then debits India National's account and credits Bank of Thailand's account. Bank of Thailand then credits XYZ's account, thereby completing the transfer.

We refer to the transferor in an EFT as the "originator" and the transferee as the "beneficiary." References to "a defendant" or "defendants" generally— as opposed to specific references to Jaldhi Overseas Pte Ltd.—indicates the party, whether originator or beneficiary, whose property is the object of a Rule B attachment.

3

*Shipping, Ltd. v. TPI*, 310 F.3d 263, 278 (2d Cir. 2002), this momentary passage was sufficient to vest jurisdiction in the United States District Court of the Southern District of New York.

We are now presented with the question of whether the rule of *Winter Storm* should be reconsidered and, upon reconsideration, overruled. Specifically, this appeal raises the issue of whether EFTs of which defendants are the beneficiary are attachable property of the defendant pursuant to Rule B of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions of the Federal Rules of Civil Procedure ("Rule B" of "the Admiralty Rules")[2] under our decisions in *Winter Storm*, 310 F.3d at 278, *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 436 (2d Cir. 2006), and *Consub Delaware LLC v. Schahin Engenharia Limitada*, 543 F.3d 104, 109 (2d Cir. 2008). We now conclude, with the consent of all of the judges of the Court in active service, that *Winter Storm* was erroneously decided and therefore should no longer be binding precedent in our Circuit.[3]

---

[2] Rule B(1)(a) of the Admiralty Rules states, in relevant part:

> If a defendant is not found within the district, when a verified complaint praying for attachment and the affidavit required by Rule B(1)(b) are filed, a verified complaint may contain a prayer for process to attach the defendant's tangible or intangible personal property—up to the amount sued for—in the hands of garnishees named in the process.

Fed. R. Civ. P. Supp. R. B(1)(a).

[3] For clarity, we pause to note that by overturning *Winter Storm*, we also abrogate any decision insofar as it has relied on *Winter Storm*, specifically, *Consub Delaware LLC v. Schahin Engenharia Limitada*, 543 F.3d 104 (2d Cir. 2008).

Our decision in *Winter Storm* produced a substantial body of critical commentary. Indeed, within four years of our decision, we ourselves had begun to question the correctness of *Winter Storm*, *see Aqua Stoli*, 460 F.3d at 445 n.6 ("The correctness of our decision in *Winter Storm* seems open to question . . . ."), as have, more recently, some judges of the United States District Court for the Southern District of New York, *see e.g.*, *Hannah Bros. v. OSK Mktg. & Commc'ns, Inc.*, 609 F. Supp. 2d. 343, 352 n.3 (S.D.N.Y. 2009) ("The discussion above also underscores a point that has become *conventional wisdom* in this district—that *Winter Storm* and *Aqua Stoli* may merit reconsideration . . . ." (emphasis added)). Various commentators and courts have suggested that *Winter Storm* directly led to strains on federal courts and international banks operating within our Circuit. *See, e.g.*, Permanent Editorial Bd. for the Uniform Commercial Code, PEB Commentary No. 16: Sections 4A-502(d) and 4A-503, at 5 n.4 (July 1, 2009) ("PEB Commentary") ("[T]he Winter Storm approach is proving to be practically unworkable."). And some have even suggested that *Winter Storm* has threatened the usefulness of the dollar in international transactions. *See generally id.* ("[T]his explosion of writs creates an additional threat to the U.S. dollar as the world's primary reserve currency and New York's standing as a center of international banking and finance."); *see also* Lawrence W. Newman & David Zaslowsky, *Is There Finally a Backlash Against Rule B Attachments?*, 241 N.Y. L.J. 3 (2009) ("[W]hen lawyers are advising their clients that the best way to avoid Rule B attachments is to conduct maritime and perhaps other transactions in a currency other than U.S. dollars, there are

5

emerging risks of a significant reduction in the use of the dollar as the dominant currency of international commerce.").

The unforeseen consequences of *Winter Storm* have been significant. According to *amicus curiae* The Clearing House Association L.L.C.—whose members are ABN AMRO Bank N.V.; Bank of America, National Association; The Bank of New York Mellon; Citibank, National Association; Deutsche Bank Trust Company Americas; HSBC Bank USA, National Association; JPMorgan Chase Bank, National Association; UBS AG; U.S. Bank National Association; and Wells Fargo Bank, National Association—from October 1, 2008 to January 31, 2009 alone "maritime plaintiffs filed 962 lawsuits seeking to attach a total of $1.35 billion. These lawsuits constituted 33% of all lawsuits filed in the Southern District, and the resulting maritime writs only add to the burden of 800 to 900 writs already served daily on the District's banks." Amicus Br. 3-4. Judge Scheindlin recently outlined the effect of *Winter Storm* on international banks located in New York:

> This Court was recently informed that, currently, leading New York banks receive numerous new attachment orders and over 700 supplemental services of existing orders *each day*. This is confirmed by the striking surge in maritime attachment requests in this district, which now comprise approximately one third of all cases filed in the Southern District of New York. As a consequence, New York banks have hired additional staff, and suffer considerable expenses, to process the attachments. The sheer volume . . . leads to many false "hits" of funds subject to attachment, which has allegedly introduced significant uncertainty into the international funds transfer process.

*Cala Rosa Marine Co. Ltd. v. Sucres et Deneres Group*, 613 F. Supp. 2d 426, 431-32 n.7 (S.D.N.Y. 2009) (citation omitted).

Our holding in *Winter Storm* not only introduced "uncertainty into the international funds transfer process," *id.*, but also undermined the efficiency of New York's international funds transfer business. As the Federal Reserve Bank of New York noted in its *amicus curiae* brief in support of the motion for rehearing *en banc* by the defendant in *Winter Storm*, "efficiency is fostered by protecting the intermediary banks; justice is fostered by expressly telling litigants where the process should be served. . . . [*Winter Storm*] disrupt[ed] this balance and threaten[ed] the efficiency of funds transfer systems, perhaps including Fedwire." Amicus Br. of Federal Reserve Bank of New York 9, *Winter Storm*, 310 F.3d 263 (No. 02-7078). Undermining the efficiency and certainty of fund transfers in New York could, if left uncorrected, discourage dollar-denominated transactions and damage New York's standing as an international financial center. *See, e.g.*, PEB Commentary 6 n.4 ("*Winter Storm* and its progeny have had a far greater, and damaging, potential impact on U.S. and foreign banks located in New York than might have been anticipated."); Newman & Zaslowsky, 241 N.Y. L.J. at 3.

Overturning *Winter Storm* will dramatically affect the law of maritime attachments in our Circuit, but we must not overstate the practical effect of our holding in this case. Since we decided *Winter Storm*, decisions in both our Court and in the Southern District of New York have cabined *Winter Storm* to minimize its effects on the courts and banks of New York without overturning *Winter Storm* directly. *See, e.g.*, *STX Panocean (UK) Co. v. Glory Wealth Shipping Pte Ltd.*, 560 F.3d 127, 133 (2d Cir. 2009); *Cala Rosa*, 613 F. Supp. 2d at 432; *Marco Polo Shipping Co. Pte v. Supakit Prods. Co.*, No. 08 Civ. 10940, 2009 U.S. Dist. LEXIS 19057, at *4 (S.D.N.Y. Mar. 4, 2009). Although these cases have further complicated the law of Rule B attachments, they have also limited the reach of *Winter Storm* and thus necessarily limited the effect of our decision in the instant case.

In *STX Panocean*, we recently held that by merely registering as a domestic corporation with the New York Secretary of State, a defendant is "found" within the district for the purposes of Rule B attachment. 560 F.3d at 133. Because Rule B provides for attachment of defendant's property that is found within the district *only if* the defendant itself is *not* found within the district, our ruling in *STX Panocean* allows an international firm to avoid having its property—including property other than EFTs—attached simply by registering as a domestic corporation in New York State. Although the implications of *STX Panocean* are unknown, it would not be surprising if many international firms that engage in dollar-denominated transactions register in New York State to avoid attachment of their property.

In *Cala Rosa*, Judge Scheindlin denied a maritime plaintiff's request for "continuous service" of an attachment on banks—a decision that, if upheld on appeal, would likely further limit the usefulness of attachments of EFTs. 613 F. Supp. 2d at 432. In light of our decision in *Reibor International Ltd. v. Cargo Carriers Ltd.*, 759 F.2d 262, 266 (2d Cir. 1985), which held that an attachment is void unless a garnishee actually "possesses" defendant's property when the attachment is served, and the instantaneous nature of most EFTs, Judge Scheindlin's decision renders many maritime attachments effectively unenforceable. As Judge Scheindlin explained:

> Many courts, including this one, have noted that in light of *Reibor* a continuous service provision is necessary, in practice, to allow attachment of EFTs. That is no doubt true. But *Reibor* provides the proper response to this concern: the New York "rule works, to be sure, to the detriment of an attaching creditor, but that is simply the way the law was intended to operate."
>
> Many courts have also expressed concern that in the absence of a continuing service provision, plaintiffs will post process servers at bank offices around the clock in an attempt to capture EFTs at the precise moment of their arrival. I agree that this is likely and that this would be highly disruptive to New York banks. Accordingly, I decline to specially appoint any plaintiff-designated process servers. As a result, pursuant to Rule B(1)(d)(ii), I authorize only the United States Marshals to serve the process and any supplemental process.

8

Plaintiff expresses concern that this will impose an undue burden on the United States Marshals. Plaintiff's concern, though appreciated, is overstated: nothing requires the Marshals to repetitively serve the banks with attachment orders around the clock. Further, plaintiff's duty to bear the costs of Marshal-served processes will help limit the Marshals' workload.

*Cala Rosa*, 613 F. Supp. 2d at 432 (footnotes omitted) (quoting *Reibor*, 759 F.2d at 268). A Circuit-wide decision rejecting a continuous service provision in the case of the attachment of EFTs would arguably limit the reach of *Winter Storm*.

Finally, in *Marco Polo*, Judge Koeltl recently required a "plausible" showing that defendant's funds were *actually* passing through Southern District of New York, as opposed to *hypothetically* passing through the Southern District. *See* 2009 U.S. Dist. LEXIS 19057, at *4. Judge Koeltl noted that "[t]he fact that the defendant is still actively doing business and at some point in the past has conducted its business in United States dollars may mean that the defendant could transfer funds through a New York bank in the future, but it hardly makes it plausible that it actually will." *Id.* at *5. By requiring more than a hunch to obtain an attachment, Judge Koeltl further limited the usefulness of attachment of EFTs sanctioned by *Winter Storm*.

Taken together, these cases may have limited the practical usefulness of our holding in *Winter Storm* to plaintiffs and thus may also have reduced the practical effects of overturning that decision. This is not to say that we take our decision to overturn *Winter Storm* lightly but, rather, that we seek to allay any concerns that the decision in this case is wholly unanticipated, surprising, or disruptive to ongoing financial practices. In doing so, we recognize a trend toward limiting maritime attachments of EFTs in our Circuit and take this opportunity to definitively untangle the doctrinal knot created by *Winter Storm* and its progeny.

## BACKGROUND

In this action, plaintiff The Shipping Corporation of India, Ltd. ("SCI" or "plaintiff")

appeals from a June 27, 2008 order of the United States District Court for the Southern District of

New York (Jed S. Rakoff, *Judge*) insofar as it vacated portions of an order of maritime attachment

and garnishment (the "attachment") entered by the District Court on May 7, 2008, pursuant to Rule

B. Specifically, the June 2008 order vacated the attachment of EFTs sent from third parties not

involved in this litigation to defendant Jaldhi Overseas Pte Ltd. ("Jaldhi" or "defendant") in the

amount of $3,533,522.

Jaldhi cross-appeals from the same June 27, 2008 order insofar as it denied Jaldhi's motion

for counter-security for various counterclaims to be arbitrated in London on the ground that SCI, as

an alleged instrumentality of the government of India, was entitled to immunity from pre-judgment

attachment under the Foreign Sovereign Immunity Act, 28 U.S.C. §§ 1602-1611 ("FSIA").

On appeal, the parties raise the following issues: (1) whether EFTs of which a defendant is

the beneficiary are attachable property of that defendant under our decisions in *Winter Storm*, 310

F.3d 263, *Aqua Stoli*, 460 F.3d 434, and *Consub Delaware*, 543 F.3d 104; and (2) whether SCI is

entitled to immunity under the FSIA from pre-judgment attachment of security for Jaldhi's

counterclaims to be arbitrated in London.

The relevant factual and procedural history is as follows. In March 2008, SCI chartered its

vessel *M/V Rishikesh* (the "vessel") to defendant to transport iron ore from India to China.[4]

Specifically, the charter provided that SCI was to deliver the vessel to Jaldhi on March 29, 2008,

---

[4] Although the charter commits the parties to resolve any disputes under English law and by arbitration in London, it is unclear from the record and briefs whether any arbitrations in London were commenced or are ongoing.

"with hull, machinery, and equipment in a thoroughly efficient state." The vessel was delivered to Jaldhi on March 29, 2008, in compliance with the terms of the charter. While in port in Kolkata, India the next day, a crane on board the vessel collapsed, killing the crane operator, halting cargo operations, and causing Jaldhi to place the vessel "off hire," *i.e.*, to suspend the charter.

On May 2, 2008, SCI issued an invoice to Jaldhi seeking payment of Jaldhi's unpaid balance of $3,608,445. After not receiving payment, SCI filed a complaint in the District Court seeking an *ex parte* maritime attachment pursuant to Rule B of the Admiralty Rules on May 7, 2008 for the balance, interest, and attorneys' fees for a total of $4,816,218. According to SCI, the vessel came back "on hire" on April 13, 2008, when its cranes passed safety inspections, and therefore Jaldhi owes payments under the charter from that date forward. On May 8, 2008, the District Court entered an *ex parte* order of Maritime Attachment and Garnishment in the amount of $4,816,218 and noted in its order that the attachment applied

> against all tangible or intangible property belonging to, claimed by or being held for the Defendant by any garnishees within this District, including but not limited to electronic fund transfers originated by, payable to, or otherwise for the benefit of Defendant, whether to or from the garnishee banks or any other electronic funds transfers . . . .

J.A. 15. SCI then filed an amended complaint on May 15, 2008, to adjust the amount attached to reflect additional fees and a $1,260,585 payment from Jaldhi to SCI, bringing the total attachment to $4,689,247. On May 22, 2008, Jaldhi filed a motion to vacate the attachment pursuant to Rule E of the Admiralty Rules[5] and sought counter-security against SCI to cover any damages resulting from

---

[5] Rule E of the Admiralty Rules states, in relevant part:

Whenever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with

11

the crane accident. By that date, SCI had attached EFTs in the amount of $4,873,404.90. EFTs where defendant was the beneficiary comprised $4,590,678.60 of the total amount attached, with the remainder consisting of EFTs where defendant was the originator.[6] The parties then worked together to release any funds attached in excess of the amount provided in the attachment order.

In a Memorandum Order dated June 27, 2008, Judge Rakoff vacated his May 8, 2008 attachment order insofar as it applied to EFTs of which defendant was the beneficiary. *See Shipping Corp. of India, Ltd. v. Jaldhi Overseas PTE Ltd.*, No. 08 Civ. 4328, 2008 U.S. Dist. LEXIS 49209, at *5 (S.D.N.Y. June 27, 2008). Judge Rakoff based his decision to vacate the attachment order on his own prior decision in *Seamar Shipping Corp. v. Kremikovtzi Trade Ltd.*, 461 F. Supp. 2d 222 (S.D.N.Y.

---

these rules.

Fed. R. Civ. P. Supp. R. E(4)(f).

[6] Specifically, EFTs from and to the following parties were seized while they briefly passed through the computer systems of banks located in the Southern District of New York:

| Originator | Beneficiary | Amount Restrained |
| --- | --- | --- |
| Sesa Goa Ltd. | Jaldhi Overseas Ltd. | $ 2,377,533.90 |
| Sarat Chatterjee & Co. | Jaldhi Overseas Ltd. | $ 1,399,960.00 |
| Sarat Chatterjee & Co. | Jaldhi Overseas Ltd. | $ 449,960.00 |
| Sarat Chatterjee & Co. | Jaldhi Overseas Ltd. | $ 269,363.72 |
| Bhusan Power & Steel Ltd. | Jaldhi Overseas Ltd. | $ 93,861.00 |
| | | $ 4,590,678.60 |
| Jaldhi Overseas Ltd. | Bridge Oil Ltd. | $ 282,726.35 |
| | Total | $ 4,873,404.90 |

J.A. 32.

2006), in which he had concluded that EFTs en route to a defendant were not attachable under Rule B. *See Shipping Corp. of India*, 2008 U.S. Dist. LEXIS 49209, at *1-2. He also concluded that SCI was entitled to sovereign immunity under the FSIA, although he did not make any specific findings regarding SCI's sovereign status. *Id.* at * 3. Noting, however, that there were differing opinions among judges of the Southern District of New York regarding the attachment of EFTs where the defendant is the beneficiary of the transfer, Judge Rakoff certified the matter for appellate review pursuant to 28 U.S.C. § 1292(b).[7] *Id.* at *2-3 ("Because the determination to vacate the attachment clearly involves a controlling question of law as to which there is substantial ground for difference of opinion, and because an immediate appeal from the order may materially advance the ultimate termination of the litigation, the Court hereby certifies the vacatur for interlocutory appeal . . . ." (internal quotation marks and citation omitted)).

---

[7] This statute states:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: *Provided, however*, That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

28 U.S.C. § 1292(b).

# DISCUSSION

## A.     Standard of Review

We generally review a district court's decision to vacate a maritime attachment for "abuse of discretion." *See, e.g., Consub Del.*, 543 F.3d at 108; *cf. Sims v. Blot*, 534 F.3d 117, 132 (2d Cir. 2008) ("A district court has abused its discretion if it *based its ruling on an erroneous view of the law* or on a clearly erroneous assessment of the evidence, or rendered a decision that cannot be located within the range of permissible decisions." (internal quotation marks, citation, and alterations omitted) (emphasis added)).  Because the District Court made a threshold ruling of law before exercising its discretion, our review is *de novo.  See Aqua Stoli*, 460 F.3d at 439.

## B.     EFTs as Attachable Property

Rule B of the Admiralty Rules permits attachment of "the defendant's tangible or intangible personal property."  Fed. R. Civ. P. Supp. R. B(1)(a).[8]  From a plain reading of the text, it is clear that to attach an EFT under Rule B, the EFT must both (1) be "tangible or intangible property" *and* (2) be the "defendant's."  *Id.*

Before we can reach the question presented squarely in this appeal—whether an EFT is defendant's property when defendant is the beneficiary of that EFT—we must first consider the

---

[8] For a brief overview of the history and purpose of maritime attachments, see *Aqua Stoli*, 460 F.3d at 437-38.

threshold issue of whether EFTs are indeed "defendant's" property subject at all to attachment under the Admiralty Rules. We first held that EFTs were in fact attachable property under Rule B seven years ago in *Winter Storm*. Although we have subsequently applied *Winter Storm* in numerous cases, *see, e.g.*, *Consub Del.*, 543 F.3d 104; *Aqua Stoli*, 460 F.3d 434, we now conclude, as noted earlier, that *Winter Storm* was erroneously decided and should no longer be binding precedent in this Circuit.

We readily acknowledge that a panel of our Court is "bound by the decisions of prior panels until such time as they are overruled either by an *en banc* panel of our Court or by the Supreme Court," *United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004), and thus that it would ordinarily be neither appropriate nor possible for us to reverse an existing Circuit precedent. In this case, however, we have circulated this opinion to all active members of this Court prior to filing and have received no objection. *See, e.g.*, *United States v. Crosby*, 397 F.3d 103, 105 n.1 (2d Cir. 2005); *Jacobson v. Fireman's Fund Ins. Co.*, 111 F.3d 261, 268 n.9 (2d Cir. 1997).[9]

Our reasons for reversing a relatively recent case are twofold. First, and most importantly, we conclude that the holding in *Winter Storm* erroneously relied on *Daccarett*, 6 F.3d 37, to conclude that EFTs are attachable property. *Winter Storm*, 310 F.3d at 276-78. Second, as noted above, the

---

[9] We refer to this process as a "mini-*en banc*." *See United States v. Parkes*, 497 F.3d 220, 230 n.7 (2d Cir. 2007); *see also* Jon O. Newman, *The Second Circuit Review—1987-1988 Term: Foreword: In Banc Practice in the Second Circuit, 1984-1988*, 55 Brook. L. Rev. 355, 367-68 (1989) (noting that judges will occasionally circulate particularly important panel opinions before filing).

15

effects of *Winter Storm* on the federal courts and international banks in New York are too significant to let this error go uncorrected simply to avoid overturning a recent precedent.

Beginning in *Winter Storm*, we have held that "EFT funds in the hands of an intermediary bank" are "subject to Admiralty Rule B attachment." *Id.* at 278. In that case, plaintiff sought to attach an EFT that originated in defendant's account with the Bank of Ayudhya—based in Bangkok, Thailand—while it was en route to a third party who maintained an account with the Royal Bank of Scotland in London. *Id.* at 266. The EFT passed through the Bank of New York—the "intermediary bank"—which is headquartered in Manhattan. *Id.* The District Court vacated the attachment of the EFT because, in its view, the EFT was not "property" within the meaning of Rule B. *Id.* at 267. Specifically, she concluded that there was no federal law on point and that state law—New York's version of the Uniform Commercial Code—forbade courts from attaching funds in an intermediary bank. *See id.*; *see also* N.Y. U.C.C. § 4-A-503.

On appeal, a panel of our Court concluded that relevant federal law indicated that EFTs were indeed "property" that could be attached in a Rule B proceeding and therefore recourse to state law was unnecessary. *Winter Storm*, 310 F.3d at 278. In a comprehensive opinion, Judge Haight, sitting by designation, offered three reasons to support this decision.

First, the panel observed that Rule B itself—which covers "defendant's tangible or intangible personal property," Fed. R. Civ. P. Supp. R. B(1)(a)—is written in very broad language. "It is

16

difficult to imagine words more broadly inclusive than 'tangible or intangible.' . . . The phrase is the secular equivalent of the creed's reference to the maker 'of all there is, seen and unseen.'" *Winter Storm*, 310 F.3d at 276. This broad language, the panel reasoned, sweeps sufficiently far to encompass even ephemeral EFTs.

Second, the panel stated that "[t]here is no question that federal admiralty law regards a defendant's *bank account* as property subject to maritime attachment under Rule B." *Id.* (emphasis added). By extension, the panel reasoned, "[we are un]able to discern in admiralty law or elsewhere a basis for regarding [the defendant's] funds in [the intermediary bank's] hands prior to their electronic transfer to [the beneficiary] as anything other than the funds held by [the intermediary bank] for the account of [the defendant]." *Id.* Since a defendant's bank account was attachable property, the panel reasoned, the effectively equivalent EFTs should also be attachable property of the defendant.

Third, the panel observed that in *Daccarett* we had upheld the seizure of EFTs that passed through intermediary banks in New York City, where the EFTs were used by a Colombian criminal cartel to transfer funds from accounts in Luxembourg to accounts in Panama and Colombia. 6 F.3d at 44, 54; *see also id.* at 55 (holding that "an EFT while it takes the form of a bank credit at an intermediary bank is clearly a seizable *res* under the forfeiture statutes"). The seizures in that criminal case were made pursuant to 21 U.S.C. § 881, a penal statute which borrows the procedures

17

for asserting maritime liens under Admiralty Rule C.[10] The panel reasoned that there was "no principled basis" for applying the procedures outlined in Admiralty Rule C to a seizure of an EFT in a forfeiture action, but not to a maritime attachment under Rule B. *Winter Storm*, 310 F.3d at 278.

Relying on these three reasons—each of which was based on federal law—the *Winter Storm* panel concluded that "EFT funds in the hands of an intermediary bank may be attached pursuant to Admiralty Rule B(1)(a)." *Id.* Accordingly, the panel had no occasion to look to state law, as Judge Scheindlin had done, to determine whether EFTs were attachable.[11] *Id.*

---

[10] 21 U.S.C. § 881 states, in relevant part:

(a)     The following shall be subject to forfeiture to the United States and no property right shall exist in them:
. . . .

(6)     All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter.

21 U.S.C. § 881(a)(6); *see also id.* § 881(b) (requiring property to be seized "in the manner set forth in [18 U.S.C. § 981(b)]"); 18 U.S.C. § 981(b)(2)(A) (permitting a seizure without a warrant where "a complaint for forfeiture has been filed in the United States district court and the court issued an arrest warrant in rem pursuant to the Supplemental Rules for Certain Admiralty and Maritime Claims").

[11] Although the panel did briefly discuss New York law, it concluded that New York law was not controlling because federal law—particularly *Daccarett*—adequately defined the contours of Rule B. *See Winter Storm*, 310 F.3d at 279.

Upon further consideration, we find *Winter Storm*'s reasons unpersuasive and its consequences untenable. Most importantly, we find that *Winter Storm*'s reliance on *Daccarett* was misplaced. *Daccarett* did not decide that the originator or beneficiary of an EFT had a *property interest* in the EFT; it held only that funds traceable to an illegal activity were subject to forfeiture under 21 U.S.C. § 881. *See Aqua Stoli*, 460 F.3d at 445 n.6 ("Because *Daccarett* was a forfeiture case, its holding that EFTs are attachable assets does not answer the more salient question of *whose* assets they are while in transit."). Under the forfeiture laws, funds can be seized even if they do not constitute property of the defendant because "no property right shall exist in . . . [all] moneys . . . traceable to [a violation of Title 21, Chapter 13, Subchapter I of the United States Code]." 21 U.S.C. § 881(a). To be eligible for forfeiture, the EFTs needed only to be traceable to the illegal activities, and thus the court in *Daccarett* was required only to assess whether the EFTs in that case were in fact traceable to illegal activities. No further inquiry into the identity of the owner of the EFTs was necessary—indeed, that question was wholly irrelevant.

For maritime attachments under Rule B, however, the question of ownership is critical. As a remedy *quasi in rem*, the validity of a Rule B attachment depends entirely on the determination that the *res* at issue is the property of the defendant at the moment the *res* is attached. *See, e.g.*, *Transportes Navieros y Terrestres S.A. de C.V. v. Fairmount Heavy Transp. N.V.*, 572 F.3d 96, 108 (2d Cir. 2009). Because a requirement of Rule B attachments is that the defendant is not "found within the district,"

19

the *res* is the only means by which a court can obtain jurisdiction over the defendant.[12]  If the *res* is

not the property of the defendant, then the court lacks jurisdiction.  In contrast, civil forfeiture is a

remedy *in rem*.  *In rem* jurisdiction is based on the well-established theory that the "thing is itself

treated as the offender and made the defendant by name or description."  *California v. Deep Sea

Research, Inc.*, 523 U.S. 491, 501 (1998).  Thus, for *in rem* remedies such as forfeitures, ownership of

the *res* is irrelevant, as the court has personal jurisdiction regardless of who owns the *res* at issue.

Although not considered by the *Winter Storm* panel, this distinction provides, in our view, a

principled basis for allowing EFTs to be subject to forfeiture but not attachment.  In sum, *Daccarett*

provides no persuasive guidance on the validity of Rule B attachments of EFTs and should not

serve as the foundation for a rule that allows the attachment of EFTs under Rule B.

Without the support of *Daccarett*, we are unpersuaded that either the text of Rule B or our

past maritime holdings relating to defendants' bank accounts compel us to conclude as a matter of

---

[12]  The "jurisdiction" at issue in a Rule B attachment proceeding is *quasi in rem*, rather than *in personam* or *in rem*.  In Rule B attachment proceedings, jurisdiction is predicated on the presence within the court's territorial reach of property in which the Rule B defendant has an interest.  *See Black's Law Dictionary* 857 (7th ed. 1999) (defining *quasi in rem* as "[j]urisdiction . . . based on [a] person's interest in property located within the court's territory"); *see also* Restatement (Second) of Judgments § 6 cmt. a, at 73; *id.* § 8 cmt. a, at 83-84.  Because of the requirement that the defendant not be "found" within the district where the action is brought, Fed. R. Civ. P. Supp. R. B(1)(a), Rule B contemplates that a court will lack *in personam* jurisdiction over the defendant when it orders that a writ of attachment be issued.  In such a proceeding, the court's coercive authority is coterminous with the scope of its jurisdiction, and limited to the extent of the defendant's interest in the attached property; that authority does not extend to the exercise of *in personam* jurisdiction over a Rule B defendant.

20

federal law that an EFT is "*defendant's . . .* personal property." Fed. R. Civ. P. Supp. R. B(1)(a)

(emphasis added). Moreover, we are unaware of any historical rationale that justifies the extension

of federal maritime common law to support the Rule B practices that have taken place under the

rule of *Winter Storm*. One of the primary grounds for the historical development of Rule B

attachments was that "[a] ship may be here today and gone tomorrow." *Polar Shipping Ltd. v. Oriental*

*Shipping Corp.*, 680 F.2d 627, 637 (9th Cir. 1982); *see also Schiffahartsgesellschaft Leonhardt & Co. v. A.*

*Bottacchi S.A. De Navegacion*, 732 F.2d 1543, 1547 (11th Cir. 1984) (noting that a "relevant

commercial . . . consideration[ ]" relating to Rule B practices is that "a ship's ability to dock, unload

cargo, and fill its hold with goods intended for another destination—all within twenty four

hours—imposes tremendous pressure on creditors desiring to attach a vessel or property located

aboard"). EFTs, like ships in a port, are transitory. Streamlined Rule B practices, however,

developed out of the concern that ships might set sail quickly, not because the courts intended to

arm maritime plaintiffs with writs of attachment prior to the arrival of the ship in port. Under

*Winter Storm*, however, maritime plaintiffs now seek writs of attachment pursuant to Rule B long

before the defendant's property enters the relevant district, often based solely on the speculative

hope or expectation that the defendant will engage in a dollar-denominated transaction that involves

an EFT during the period the attachment order is in effect. *See, e.g., TJ Shipping & Logistics v. Havi*

*Ocean, LLC*, No. 09 Civ. 1555, 2009 WL 454137, at *2-3 (S.D.N.Y. Feb. 19, 2009). Such practices,

21

which have increased dramatically since *Winter Storm*, bear little, if any, relation to the text of Rule B or to our jurisprudence relating to the bank accounts of maritime defendants.

When there is no federal maritime law to guide our decision, we generally look to state law to determine property rights. *See, e.g.*, *Reibor*, 759 F.2d at 266 (citing *California ex rel. State Lands Comm'n v. United States*, 457 U.S. 273, 283 (1982)) (considering state law where federal admiralty law is "thin" and "a decision . . . contrary to the general rule of the state might have disruptive consequences for the state banking system" (internal quotation marks omitted)). Accordingly, we now look to state law to determine whether EFTs can be considered a "defendant's" property for purposes of attachment under Rule B.

New York State does not permit attachment of EFTs that are in the possession of an intermediary bank. Specifically, New York law states that "a court may restrain . . . the beneficiary's bank from releasing funds to the beneficiary or the beneficiary from withdrawing the funds." N.Y. U.C.C. § 4-A-503; *see also id.* § 4-A-503 cmt. 1 ("After the funds transfer is completed by acceptance of a payment order by the beneficiary's bank, [the beneficiary's] bank can be enjoined from releasing funds to the beneficiary or the beneficiary can be enjoined from withdrawing funds.").

As for those interested in obtaining the originator's funds, New York law is also clear. Specifically, "a court may restrain . . . an originator's bank from executing the payment order of the originator." *Id.* § 4-A-503; *see also id.* § 4-A-502 cmt. 4 ("A creditor of the *originator* can levy on the

account of the originator in the originator's bank *before the funds transfer is initiated* . . . . The creditor of

the originator *cannot reach any other funds because no property of the originator is being transferred.*" (emphases

added)).  Apart from these injunctions, "[a] court may not otherwise restrain [any activity] with

respect to a funds transfer."  *Id.* § 4-A-503; *see also European Am. Bank v. Bank of N.S.*, 784 N.Y.S.2d

99, 100-01 (1st Dep't 2009) (noting that attachments served on intermediary banks cannot be

enforced); N.Y. U.C.C. § 4-A-503 cmt. 1 ("*No other injunction is permitted.  In particular, intermediary*

*banks are protected . . . .*" (emphases added)).

Finally, an authoritative comment accompanying the New York Uniform Commercial Code

states that a beneficiary has no property interest in an EFT because "until the funds transfer is

completed by acceptance by the beneficiary's bank of a payment order for the benefit of the

beneficiary, *the beneficiary has no property interest in the funds transfer* which the beneficiary's creditor can

reach."   N.Y. U.C.C. § 4-A-502 cmt. 4 (emphasis added); *cf. Sigmoil Res., N.V. v. Pan Ocean Oil Corp.*

*(Nigeria)*, 650 N.Y.S.2d 726, 727 (1st Dep't 1996) ("Neither the originator who initiates payment nor

the beneficiary who receives it holds title to the funds in the account at the correspondent bank.").

Taken together, these provisions of New York law establish that EFTs are neither the property of

the originator nor the beneficiary while briefly in the possession of an intermediary bank.

Because EFTs in the temporary possession of an intermediary bank are not property of

either the originator or the beneficiary under New York law, they cannot be subject to attachment

under Rule B. As stated earlier, Rule B allows attachment only of "*defendant's . . .* property." Fed. R. Civ. P. Supp. R. B(1)(a) (emphasis added). If the EFTs are not the property of either the originator or the beneficiary, then they cannot be "defendant's . . . property " and therefore are not subject to Rule B attachment.[13]

In sum, because there is no governing federal law on the issue and New York law clearly prohibits attachment of EFTs, we conclude that EFTs being processed by an intermediary bank in New York are not subject to Rule B attachment. Accordingly, we conclude that the District Court did not err in vacating the portions of the order in this action affecting EFTs of which defendant was the beneficiary. We remand the cause to the District Court with directions to consider whether there are grounds for not vacating the remaining portions of the attachment order affecting EFTs of which defendant was the originator.

## C.    Sovereign Immunity

Because it is probable that on remand the District Court will vacate the May 8, 2008 attachment order in its entirety, we decline to consider the second argument on appeal—whether

---

[13] If it is argued that property rights must vest in some entity at all times, then perhaps New York law envisages EFTs as the property of the intermediary bank for the short while or instant during which they remain in the bank's possession. Because this question is not presented in this case, we need not address it here. If, however, a court were to find that the EFTs were property of the intermediary bank, it would have no effect on the application of Rule B. If EFTs are the property of the intermediary bank and that bank is a defendant for purposes of Rule B, then the property would still not be subject to Rule B attachment because these intermediary banks are necessarily "found within the district " in which the EFTs are found and Rule B only allows the attachment of property within the district that belongs to defendants "not found within the district." Fed. R. Civ. P. Supp. R. B(1)(a).

24

the District Court erred in denying Jaldhi's motion for counter-security on the ground that SCI was a sovereign instrumentality. Without briefing before us on the issue, we leave it to the District Court to determine if Jaldhi's motion for counter-security should be denied as moot. If it is not moot, the District Court is directed to give plenary reconsideration to the claim of sovereign immunity made by SCI, with such jurisdictional discovery as may be appropriate in the circumstances. *See generally First City, N.A. v. Rafidain Bank*, 150 F.3d 172, 176-77 (2d Cir. 1998) ("[G]enerally a plaintiff may be allowed limited discovery with respect to the jurisdictional issue [in actions where FSIA applies.]" (internal quotation marks omitted)).

**CONCLUSION**

In summary, we hold the following:

(1)     We overrule our previous decision in *Winter Storm*, 310 F.3d 263, and conclude that EFTs being processed by an intermediary banks are not subject to attachment under Rule B.

(2)     In accordance with our conclusion that such EFTs are not subject to attachment, we AFFIRM the June 27, 2008 order of the District Court insofar as it vacated the portions of the May 8, 2008 attachment order that affect EFTs of which defendant is the beneficiary and we REMAND the cause to the District Court with directions to consider whether there are other grounds for not vacating the remaining portion of the attachment order that affects EFTs of which defendant is the originator.

(3)     Finally, we VACATE the June 27, 2008 order of the District Court insofar as it denied Jaldhi's motion for counter-security and REMAND the cause to the District Court to consider whether to dismiss that motion.

The mandate shall issue forthwith. Each party shall bear its own costs.

25